## MATHIESON et al. v. CRAVEN et al.

(District Court, D. Delaware. November 8, 1915.)

No. 271.

*(Syllabus by the Court.)*

**1. WILLS ☞820—DEVISE—EQUITABLE CHARGE—"RAISE OUT OF OR CHARGE UPON."**

Where a testator devised certain farms in fee in trust and directed the trustee, on the attainment of the age of twenty-one years by the youngest of the testator's sons who should live so long, to "raise out of or charge upon" them such sum of money as should be sufficient to equalize the shares of his sons in his estate, he thereby created an equitable charge or trust attaching to the farms from and after his death, although such charge could not be ascertained in amount until the making of an appraisement of the farms as directed in the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 2114-2119, 2121; Dec. Dig. ☞820.]

**2. WILLS ☞608—CONSTRUCTION—RULE IN SHELLEY'S CASE.**

While the rule in Shelley's Case applies equally to equitable and legal estates it is necessary to its operation that the estate of the ancestor and the limitation to the heirs be of the same quality, namely, both legal or both equitable, and the rule, therefore, has no application where the first estate is the subject of an active trust, and there is a limitation over of the estate discharged of the trust.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 1372-1378: Dec. Dig. ☞608.]

**3. INFANTS ☞34—JURISDICTION—ORPHANS' COURT—COURT OF CHANCERY—PROPERTY OF MINORS.**

In Delaware jurisdiction over the application of minors' property to their maintenance and education is, in the absence of a valid trust to that end, committed by statute to the Orphans' Court, and is not possessed by the Court of Chancery.

[Ed. Note.—For other cases, see Infants, Cent. Dig. §§ 64, 67; Dec. Dig. ☞34.]

**4. EQUITY ☞87—LIMITATION OF ACTIONS—OPERATION OF STATUTE.**

The bill in this case having been filed to enforce payment of money charged on land as a legacy, and no legal remedy existing for the enforcement of such charge, and the exclusive remedy being in equity, no statute of limitations is applicable to the suit either directly or by analogy.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 242-244, 395; Dec. Dig. ☞87.]

**5. WILLS ☞826—LEGACY—CHARGE ON LAND—ENFORCEMENT OF PAYMENT—LACHES.**

The period of twenty years should, in the absence of laches or special equities requiring the bringing of suit earlier, be allowed for the institution of proceedings for the enforcement of such a charge.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 2128-2138; Dec. Dig. ☞826.]

**6. EQUITY ☞67—"LACHES."**

Laches with respect to the bringing of suit is unreasonable and inequitable delay in proceeding for the enforcement of a demand or right viewed in the light of the circumstances of the particular case, and is essentially an equitable defense, not depending like the operation of a statute of limitations upon the mere lapse of time, but upon the equity or inequity of permitting the asserted claim or demand to be enforced.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 191–196; Dec. Dig. ☞67.

For other definitions, see Words and Phrases, First and Second Series, Laches.]

**7. EQUITY ☞79—LIMITATION OF ACTIONS ☞174—SUIT BY CASE TO CESTUI QUE TRUST—LACHES.**

Whenever a trustee is barred by the statute of limitations from maintaining suit the cestui que trust represented by him is also barred; and probably a similar principle of representation applies to trustee and cestui que trust with respect to laches, whereby the laches of the former during the continuance of the trust relationship will be imputable to the latter; but it must be laches during the existence of the relationship and while the trustee is legally able to act.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 227; Dec. Dig. ☞79; Limitation of Actions, Cent. Dig. §§ 659–661; Dec. Dig. ☞174.]

**8. VENDOR AND PURCHASER ☞231—BONA FIDE PURCHASERS—RECORDING OF INSTRUMENT—PURPOSE OF STATUTE.**

The statutes of Delaware providing for the recording of deeds concerning lands and tenements nowhere declare that the record shall per se be notice to the world or any individual of the contents of the documents recorded, the object of the law being merely the protection of subsequent bona fide creditors, mortgagees and purchasers for value against prior deeds, by requiring their grantees within a reasonably short time to have them recorded in public offices where the record of their contents will be readily accessible to all persons using reasonable and ordinary care and diligence in the examination of titles; and the provisions of law relating to the recording of wills, while not prescribing any period within which they shall be recorded as in the case of deeds, have, nevertheless, a generally similar purpose.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. ☞231.]

**9. VENDOR AND PURCHASER ☞231—BONA FIDE PURCHASERS—EXAMINATION OF TITLE—NEGLIGENCE—NOTICE.**

It would have been gross negligence on the part of any one competent and undertaking to examine the title to and charges or encumbrances, if any, on the farms, not to have carried his examination back at least twenty years from the date of search, especially in view of the fact that the common law presumption of payment does not arise until the expiration of that period; and an examination covering a period less than twenty years would have disclosed to proposed purchasers matters of record of such character as to put them in the absence of culpable negligence upon inquiry which, if pursued with reasonable care and diligence, could not have failed to acquaint them with the existence of the charge in question, or at least to deter them from purchasing save consciously at their peril.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. ☞231.]

**10. VENDOR AND PURCHASER ☞231—BONA FIDE PURCHASERS—NOTICE—VENDOR AND PURCHASER.**

Purchasers of real estate are chargeable with knowledge or notice of those facts, of record or suggested by the record, of which they or their

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

attorneys could not have remained in ignorance save through an omission to observe any proper degree of care and diligence.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. ☞231.]

11. VENDOR AND PURCHASER ☞231—BONA FIDE PURCHASERS—EFFECT AS NO-TICE—THIRD PERSONS NOT DEALING WITH TITLE—"CONSTRUCTIVE NO-TICE."

There is an essential difference between the situation of the purchasing defendants and that of the complainants, in that the former were put upon inquiry and the latter were not; for while the recording or registry of a deed or other instrument relating to land is constructive notice of its contents to all persons subsequently dealing with the title, it does not so operate with respect to third persons not so dealing and innocently ignorant of any rights which may be affected by such deed or instrument.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 43, 55, 487, 513–539; Dec. Dig. ☞231.]

In Equity. Suit by Catharine P. Mathieson and her husband against Thomas J. Craven, as executor of and trustee under the will of Thomas Jamison, deceased, and others. Decree for complainants as to certain defendants, and bill dismissed as to others.

Walter J. Willis, David T. Marvel, and Josiah Marvel, all of Wilmington, Del., for complainants.

John H. Rodney and Alexander B. Cooper, both of Wilmington, Del., for defendant Green.

John Biggs and Armon D. Chaytor, Jr., both of Wilmington, Del., for defendant Biggs.

Josiah O. Wolcott, of Wilmington, Del., for defendants Lofland.

Thomas F. Bayard, John P. Nields, and Herbert H. Ward, all of Wilmington, Del., for defendant Craven.

James W. Lattomus, of Wilmington, Del., for defendants Jamison and others.

BRADFORD, District Judge. On a former occasion a demurrer to the bill in this case was overruled (164 Fed. 471), and since then the evidence has been taken, consisting of voluminous testimony, many exhibits and sundry stipulations, and the case has been twice elaborately argued by counsel on both sides. During the progress of the suit numerous amendments of the pleadings, both as to parties and to subject-matter, have been made. The complainants in the bill in its final form are Catharine P. Mathieson and George F. Mathieson, her husband. Mrs. Mathieson is a grandchild of Thomas Jamison, late of Red Lion Hundred, Delaware, who made his will June 3, 1864, and died in December of the same year, and she and her husband have prosecuted the suit for the enforcement of alleged rights and interests claimed to be vested in her under that will. The defendants are Thomas J. Craven, as executor of and trustee under the will, Eliza C. Green, Lawrence Lofland and Martha Lofland, John F. Biggs, Clarence Jamison (of Delaware), Charles Jamison, James Sartin, Raymond Jamison, Albert Jamison, Florence Jamison, Clarence Jamison (of Pennsylvania), Helen Grebb, Oliver V. Jamison and Laura Jami-

son. The testator when he made his will, and when he died, was the owner of certain personal property, and was seized in fee of three farms, among others, in New Castle County, Delaware, commonly known as the Jamison Corner farm, hereinafter referred to as the Corner farm, containing about 200 acres, in St. Georges Hundred, the Capelle farm, containing about 212 acres, in Red Lion Hundred, and the Homestead farm, containing about 230 acres, in St. Georges Hundred. The testator left to survive him three minor sons, Edgar, Clarence and Oliver, and three daughters, Anna, Agnes and Laura. In and by his will the testator made provision for his three daughters, and after directing the payment of his debts and funeral expenses, and making certain bequests, unnecessary to consider in this connection, provided, among other things, as follows:

"I order and direct the property on which I now reside called 'Damascus,' situated in Red Lion Hundred aforesaid, to be sold as soon after my decease as conveniently may be without sacrifice, and I hereby authorize and empower my executor to sell the same at public or private sale, for the best price or prices which can be gotten for the same, and to make, execute and deliver to the purchaser good and sufficient deeds of conveyance therefor.

"I give, devise and bequeath unto my said executor and the guardian hereinafter named and appointed for my minor children, all my estate real and personal not hereinbefore otherwise disposed of, to have and to hold the same unto them, or the survivor of them, the survivors' heirs and assigns, in trust nevertheless for the uses, intents and purposes hereinafter set forth and declared. ·

"To have and to hold the farm known as the 'Jamison Corner Farm,' containing about two hundred acres, situated in St. Georges Hundred, in trust to raise thereout the sum of four thousand dollars in such manner as they may deem most advantageous, or to make the same a charge upon the land, the principal and interest thereon payable to my said trustees for purposes hereinafter mentioned, subject to this charge to suffer my son Albert Jamison to use, occupy, rent and receive the rents, issues and profits of said farm during the term of his natural life, for his proper use and benefit. In case of the death of the said Albert leaving a child or children, or the issue of such, remainder to said child or children or the issue of any such child or children, their heirs and assigns free and discharged from the aforesaid trust. In case of the death of the said Albert without leaving issue, then remainder over to my sons Edgar, Clarence and Oliver, and their issue, the heirs and assigns of such issue, subject to the same conditions and limitations as their own shares are respectively subject to under this will. * * *

"To have and to hold the farm known as the 'Capelle Farm' containing about two hundred and twelve acres, situated in Red Lion Hundred, and the farm known as the 'Homestead Farm,' containing about two hundred and thirty acres, situated in St. Georges Hundred aforesaid, in trust, to rent the same to good and careful tenants at the best cash or share rents attainable, as in their judgments shall be most advantageous, and to collect, expend and invest the same as hereinafter provided, until the majority of my youngest son who shall live to attain the age of twenty-one years, then to raise out of or charge upon the said farms respectively, such sum or sums as shall be necessary to make equal the shares of my sons Edgar, Clarence and Oliver as hereinafter provided, and subject to such charge and conditions.

"To permit and suffer my son Clarence to use, occupy and rent and to receive the rents, issues and profits of the said 'Capelle Farm' during the term of his natural life for his proper use and benefit, and in case of the death of the said Clarence leaving a child or children, or the issue of such, remainder to such child or children or the issue of such, their heirs and assigns, free and discharged from the aforesaid trust.

"To permit and suffer my son Oliver to use, occupy and rent, and to receive the rents, issues and profits of the said 'Homestead Farm' during the term

of his natural life, for his proper use and benefit, and in case of the death of the said Oliver leaving a child or children, or the issue of such, remainder to such child or children or the issue of such, their heirs and assigns, free and discharged from the aforesaid trust.

"To invest all the rest and residue of my estate, not herein otherwise disposed of, in bonds and mortgages as aforesaid, interest payable semi-annually, and keep the same so invested until the majority of my youngest son who shall live to attain the age of twenty-one years; whereupon, I desire my trustees aforesaid to have the said 'Capelle Farm' and the said 'Homestead Farm' valued at their just and true value in money by three substantial men of the neighborhood, and that to such valuation the trustees shall add the four thousand dollars and all interest accrued thereon which hereinbefore is charged upon the 'Jamison Corner Farm,' and all the rest and residue of my estate invested as first directed in this Item, and also any other legacies or devises to which my said sons Edgar, Clarence and Oliver may become entitled, and the aggregate sum thus ascertained to apportion in equal shares among my sons Edgar, Clarence and Oliver, and their issue, the issue in all cases taking their parents' share. In the said apportionment my said son Clarence to take the said 'Capelle Farm' with such incumbrances or additions as may be necessary to equalize the shares of the said Edgar, Clarence and Oliver, and the said Oliver to take the 'Homestead Farm' with such like incumbrance or addition, but the share of the said Edgar shall be in money, invested in good bonds and mortgages as aforesaid, the interest payable to him, after such apportionment, semi-annually during his natural life and from and immediately after his death the principal and all interest accrued thereon payable to his child or children or the issue of such.

"The rents and profits arising from the Capelle and Homestead farms and the interest of all sums invested as in this Item prescribed, and so much thereof as shall be necessary, shall be expended by said guardian in the maintenance and education of my said sons Edgar, Clarence and Oliver.

"And the residue if any invested for their benefit, first deducting yearly a sum not exceeding one hundred and fifty dollars, to be expended on each of the said farms to keep the same productive and in good condition.

"In case of the death of any of my said sons Edgar, Clarence and Oliver without leaving any child or children or the issue of such, the share of the one so dying shall go to the survivor or survivors and the issue of such as may be deceased, subject to the same conditions and limitations as their own shares respectively hereinbefore designated.

"It is my will and I hereby appoint and request my esteemed friend                        shall have the guardianship of any child or children living at my decease, during the minority of such; and I urge that the utmost care be given to their moral training and education.

"I nominate and appoint my valued friend Thomas J. Craven my executor, and the said executor and guardian, trustee to effect the trusts hereinbefore set forth and declared."

Letters testamentary on the above will were granted July 27, 1866, to Craven, therein named as executor and trustee, who forthwith duly qualified and undertook the administration of the estate, and accepted as sole trustee the trusts imposed by the will; the testator having failed to fill the blank left in the will for the name of the guardian who was to be co-trustee with Craven. All the debts and funeral expenses of the testator and all legacies, pecuniary charges or demands mentioned in his will, except that for the benefit of Edgar Jamison and his surviving children or issue, have been fully paid and satisfied. Edgar died May 1, 1886, leaving to survive him two minor daughters, Catharine, born February 2, 1878, who married George F. Mathieson, and is one of the complainants, and Vesta, born December 17, 1879, who married James D. Bastian, and is still living. Oliver, the

youngest son of the testator, attained the age of twenty-one years May 1, 1878. Shortly thereafter it appears that Craven, without being judicially discharged from his trusteeship under the will, but with the consent of the three sons of the testator, ceased to act as trustee and removed to New Jersey, where he has continued to reside. But there is evidence, as hereinafter particularly referred to, to the effect that before doing so he appointed William M. Stuckert, Purnal J. Lynch and John P. Hudson, three substantial men of the neighborhood, to appraise at their just and true value in money the Capelle farm, the Homestead farm and the Corner farm, who proceeded to and did appraise the three above mentioned farms respectively at the sums hereinafter mentioned. Notwithstanding the sale, pursuant to the will, of the Damascus farm, and the payment to the executor of the purchase money therefor of $6,782.83, it is clearly established by the evidence that the testator's estate was at the time of the attainment by Oliver of his majority and thereafter indebted to the executor, and that there was not at or since that time any personal property of the estate left to be invested and kept invested in bonds and mortgages as contemplated by the testator until such attainment of full age by Oliver and the appraisement of the farms as provided in the will. Aside from the prayers for subpœna and answer and other and further relief, the bill prays in substance that the amount due to Catharine P. Mathieson, including principal and interest, under the will be ascertained and declared an equitable lien from and after the death of the testator upon the Corner, Capelle and Homestead farms in the proportions provided in the will; that their present owners be declared to hold the same subject to the above-mentioned equitable lien of Mrs. Mathieson; that Craven as trustee, or some other trustee to be appointed, be ordered and directed to raise out of the several farms the amount due to her by sale, mortgage or otherwise as the court may direct within three months; and that certain owners of portions of the above named lands and premises be restrained from conveying the same until the further order of the court.

[1, 2] The testator devised and bequeathed all his estate, real and personal, with the exception of silverware, household furniture, goods and chattels, and the Damascus farm, supposedly to two trustees, which accounts for his use of language in the plural, instead of the singular, but in fact, owing to failure to fill the above mentioned blank, only to Craven, in trust, among other things, to have and hold the Corner farm, and "to raise thereout the sum of four thousand dollars, in such manner as they may deem most advantageous, or to make the same a charge upon the land, the principal and interest thereon, payable to my said trustees for purposes hereinafter mentioned," and "subject to this charge to suffer" his son Albert "to use, occupy, rent and receive the rents, issues and profits of said farm during the term of his natural life, for his proper use and benefit," with remainder "in case of the death of the said Albert leaving a child or children or the issue of such" to "said child or children or the issue of any such child or children, their heirs and assigns, free and discharged from the aforesaid trust," but "in case of the death of the said Albert with-

out leaving issue, then remainder over to my sons Edgar, Clarence and Oliver, and their issue, the heirs and assigns of such issue, subject to the same conditions and limitations as their own shares are respectively subject to under this will." Albert Jamison died during the lifetime of the testator without leaving issue. It is unnecessary to inquire whether, had he survived his father, he would have taken an estate tail in the Corner farm, on the one hand, or, on the other, only a life estate therein, with remainder in fee to his children or their issue; for in either event, having died without leaving issue, it was the clear intent of the testator that that farm should enure to the benefit of his other sons, such intent coinciding with the principle of law preventing a lapse of the devise under such circumstances. Mowatt v. Carow, 7 Paige (N. Y.) 328, 336, 32 Am. Dec. 641. The manner and conditions in and on which the farm was to be held depended solely upon the testator's intention, to be ascertained from the will as a whole, and which when so ascertained, must control. Jacobs v. Wilmington Trust Co., 9 Del. Ch. 400, 80 Atl. 346; In re Reed's Estate, 7 Pennewill (Del.) 30, 76 Atl. 617. It was to be "subject to the same conditions and limitations as their own shares are respectively subject to under this will." This is in marked contrast with the provision that in the event of Albert surviving the testator and leaving a child or children, or issue of such, the Corner farm should go to such child, children, or issue, and their heirs and assigns, "free and discharged from the aforesaid trust." The provision for the raising or charging of the $4,000 upon or out of the farm will be more particularly referred to hereinafter. It might be inferred from the phrase "remainder over to my sons, Edgar, Clarence and Oliver, and their issue," if standing alone, that what was to pass to them comprised both the legal and the equitable estate in the land united and co-extensive, in contradistinction to an interest or estate, either wholly or partially of an equitable nature only. But this is an impossible construction when the will is read as a whole. What was to pass was to be subject to the same conditions and limitations as the shares of Albert's brothers—"as their own shares are respectively subject to under this will." The conditions and limitations under which the Capelle and Homestead farms were to be held and enjoyed were thus made applicable to the Corner farm. Edgar's share in his father's estate, aside from his participation in the rents and profits of land until the attainment of his majority by the youngest son of the testator who should live so long, was to consist wholly of personal property, or of a fund raised out of or charged upon real estate, or of both. And in so far as there was a difference between the conditions and limitations of such personal property or fund, and those applicable to the Capelle and Homestead farms it must be held that the Corner farm was intended by the testator to be subject to those applicable to the holding and enjoyment of the other two farms. Without pausing now to consider whether or not there was a difference between the personal property or fund and the farms with respect to the conditions and limitations, it is absolutely clear that the trustee was clothed with an active trust touching both real estate and personalty until the

youngest son should become of age and an appraisement of the farms should be made pursuant to the directions of the will. The testator provided that the Capelle and Homestead farms should be held "in trust to rent the same to good and careful tenants at the best cash or share rents attainable, as in their judgments shall be most advantageous, and to collect, expend and invest the same as hereinafter provided, until the majority of my youngest son who shall live to attain the age of twenty-one years, then to raise out of or charge upon the said farms respectively such sum or sums as shall be necessary to make equal the shares of my sons Edgar, Clarence and Oliver." He further directed his trustees as follows:

"To invest all the rest and residue of my estate, not herein otherwise disposed of, in bonds and mortgages as aforesaid, interest payable semi-annually, and keep the same so invested until the majority of my youngest son who shall live to attain the age of twenty-one years; whereupon, I desire my trustees aforesaid to have the said 'Capelle Farm' and the said 'Homestead Farm' valued at their just and true value in money by three substantial men of the neighborhood, and that to such valuation the trustees shall add the $4,-000 and all interest accrued thereon which hereinbefore is charged upon the 'Jamison Corner Farm,' and all the rest and residue of my estate invested as first directed in this Item, and also any other legacies or devises to which my said sons, Edgar, Clarence and Oliver may become entitled, and the aggregate sum thus ascertained to apportion in equal shares among my sons, Edgar, Clarence and Oliver, and their issue, the issue in all cases taking their parent's share. In the said apportionment my said son Clarence to take the said 'Capelle Farm' with such incumbrances or additions as may be necessary to equalize the shares of the said Edgar, Clarence and Oliver, and the said Oliver to take the 'Homestead Farm' with such like incumbrance or addition, but the share of the said Edgar shall be in money invested in good bonds and mortgages as aforesaid, the interest payable to him, after such apportionment, semi-annually during his natural life and from and immediately after his death, the principal and all interest accrued thereon, payable to his child or children or the issue of such."

Albert having died before his father without child or issue, as before stated, the Corner farm passed under the will to Craven as trustee and was held by him on trusts similar to those above quoted relating to the Capelle and Homestead farms. This conclusion is in perfect harmony with the broad and expressed intention of the testator, that the shares of Edgar, Clarence and Oliver should be equal, and that Edgar's share should consist wholly of personalty. It was the purpose of the testator that, in the above mentioned event, his three remaining sons should equally have the benefit of the Corner farm and this could be as easily and fully effected by its being held in trust for Clarence and Oliver equally as in any other manner. Being "subject to the same conditions and limitations" as the shares of the three other sons, it would enter into the basis of the appraisement directed in the will, and Edgar, Clarence and Oliver would, under the provision for the adjustment and equalization of shares equally have the benefit of that farm. It could lead to no difficulty or embarrassment. As Clarence and Oliver were to take the Capelle and Homestead farms respectively subject to such adjustment and equalization, so, likewise subject, they would together take in equal shares the Corner farm. And Edgar through such adjustment would have his equal third share

in money securities from a fund raised out of or charged upon the three farms. Any other conclusion, I think, would be based solely upon speculation, lead to confusion and defeat the plainly expressed intention of the testator. The testator nowhere declared that on Albert's death without child or issue the Corner farm should go to Edgar alone, or that Edgar's share should not consist of personalty. Indeed, the provision that such share should so consist followed that relating to the death of Albert without issue, and it is not to be assumed that, in the absence of an explicit statement to the contrary, the testator did not mean what he expressly declared without qualification. Further, not only any assumption that the testator intended that Edgar should in the specified event have had real estate instead of personalty would be inconsistent with the declaration that his share should consist of personalty, but it would have been extremely improbable that if the testator had such an intention he should have provided that the Corner farm should go to Edgar, Clarence and Oliver instead of to Edgar only. And it is further to be observed that in view of the difference between the conditions and limitations applicable under the will to personalty and those applicable to the farms, much confusion and uncertainty would naturally result from the mixture of real estate and personalty in Edgar's share. The assumption, which has been indulged in by some of those connected with the subject-matter of this suit, that on Albert's death without child or issue during the life-time of his father the Corner farm should pass in equal shares to Edgar, Clarence and Oliver would, unless the court should find a repeal purely by implication of the express provision that Edgar's share should consist of personalty, result in its consisting of both real estate and personalty—personalty so far as his share of the value of the Homestead and Capelle farms is concerned, and real estate as to his share in kind of the Corner farm. This, it seems to me, would be a wholly inadmissible construction of the will.

Oliver, the youngest son, having attained his majority May 1, 1878, it was Craven's duty under the trust imposed upon him, which he had accepted, as soon as practicable thereafter to have an appraisement made as provided for in the will. It is contended by the defendants that such appraisement was a condition precedent to the existence of any charge on the farms in favor of Edgar Jamison and his surviving children or issue, and that no such appraisement was made. If the trustee had omitted to cause it to be made he would have been derelict in the discharge of his duty under the trust. Careful examination of the evidence, notwithstanding some minor inconsistencies and contradictions, has satisfied me beyond all reasonable doubt that the trustee caused an appraisement to be made pursuant to the provisions of the will. Oliver, having attained his majority more than six months previously, joined, November 18, 1878, with Clarence and Edgar in a written request to the trustee in which they said:

"In accordance with the provisions of the will of our Father, Thomas Jamison, Dec'd, we have to request you to authorize John P. Hudson, Esq., William M. Stuckert, Esq., and Purnell J. Lynch, Esq., three substantial men of the neighborhood, to place a valuation upon the three farms, viz., the

'Capelle Farm,' the 'Homestead Farm' and the 'Jamison Corner Farm,' and to apportion the same as required by the terms of said will."

Craven, in his amended answer as trustee, under oath states:

"After refreshing his recollection by examination of certain papers in his possession, that to the best of his recollection, information and belief, between the date of November 18th, 1878, and the 8th day of August, A. D. 1879, being after the time the said Oliver V. Jamison attained his majority and became the age of twenty-one years, upon the joint request of Clarence Jamison, Oliver V. Jamison and Edgar Jamison, this defendant appointed William M. Stuckert, Purnell J. Lynch and John P. Hudson, three substantial men of the neighborhood, to appraise the Capelle Farm, the Homestead Farm and the Jamison Corner Farm, lately of Thomas Jamison, deceased, and that said appraisers did, between the dates above mentioned, appraise said three farms respectively at their just and true value in money." ·

Craven testified to the effect that he, after Oliver attained his majority, at the written request of Edgar, Clarence and Oliver above quoted, appointed Stuckert, Lynch and Hudson to appraise the farms as provided in the will; that he showed the written request to one or two of the three men whom he had appointed and explained to them why he wanted them to act as appraisers; and that the two papers, Complainants' Exhibits 1 and 17, "show that I must have appointed these men, and it shows they made an appraisement," but that he does not know "what became of that appraisement." Exhibit 17 is the written request for the appointment of appraisers, and Exhibit 1 is a paper in the handwriting of Craven, under the hands and seals of Craven and Edgar, dated August 8, 1879, in which Craven states:

"I hereby give up the control and management of the Jamison Corner Farm belonging to the Estate of Thomas Jamison (deceased) and by and with the consent of Edgar Jamison appoint Oliver V. Jamison to rent and manage and receive the rents, profits, &c. of the same and he to pay Edgar Jamison the sums due and that may become due him as interest from the appraisement of the real estate of the Jamison estate."

Edgar, August 8, 1879, signed a paper, attested by Richard T. Cann (Defendants' Exhibit D), in which he said:

"I hereby release Thomas J. Craven as trustee of the Jamison estate from all claim or claims of interest that is due or may become due on the one-third part of the appraisement of my father's est."

Purnal J. Lynch, eighty years old when giving his evidence, testified:

"Q. Did you and Mr. William M. Stuckert and Mr. John P. Hudson, at Mr. Craven's request, appraise the three farms left by Thomas Jamison at the time of his death? (Objection.) A. We agreed upon a price on each farm, to the best of my knowledge. Q. Who requested you to put a price on these farms? A. Mr. Craven asked me to meet there and fix a price. * * * Q. What did you three men do after Mr. Craven asked you to fix a price? A. We agreed upon a price, I think. Q. What was the price, or valuation, or appraisement fixed by you on the Homestead Farm? A. I think it was twenty-two thousand dollars. Q. What was the price, or valuation, or appraisement fixed by you three men on the Capelle Farm? A. Fourteen thousand dollars, to the best of my knowledge. Q. What was the price, or valuation, or appraisement, which you three men fixed for the Jamison Corner Farm, if you so fixed it? A. Twelve thousand dollars. Q. What was the total valuation put upon the three farms by you three men? A. Forty-eight thousand dollars. * * * X. After you appraised the farms,

did you do anything more? A. I think we put the price on a piece of paper and give it to Thomas Craven, or just made a little memorandum of it, that is, Mr. Craven did. * * * X. When is the next time, after the time when you appraised them, that you thought anything about, or tried to think anything about, the transaction? A. I never tried to think about it. I didn't know and I couldn't tell you anything about it. I forgot all about it until they mentioned it to me. I had forgotten it entirely until it came to my memory again. I know now that I recollect meeting Thomas Craven there. * * * X. Didn't you talk with Mr. Craven about it? A. Yes, sir; I talked with Mr. Craven. X. Lately, I mean? A. Two years ago. * * * X. At that time, Mr. Lynch, when you met Mr. Craven here, did you then remember that you had put a valuation on the farms? A. I told him I had a slight remembrance of it. * * * X. After Evans talked with you, how soon was it that you began to remember the valuations? A. I never once studied much about it until after Mr. Craven asked me to meet him, and I told Mr. Craven then that I didn't believe I knew much about it, and I didn't give him much satisfaction; but I got to thinking about it, thinking it over, and it came back to me. * * * X. Didn't you talk over with somebody, so as to bring it back to your mind, this appraisement? A. No, sir. X. How did you remember the figures? A. They came to my mind. They came to my mind and I remembered about going there and Thomas Craven asking me to go there. * * * X. In your examination in chief you said that you three men agreed on a price for each farm, 'I think.' You used the words 'I think'? A. Yes, sir. X. Are you positive about it? A. I should say, to the best of my knowledge. That is all that I can say. No. I wouldn't say positively; I wouldn't. X. Haven't you talked it over with somebody lately to bring back to your mind these figures? A. Nobody knew anything about it. I didn't know anything about it. No, sir; not a word to anybody. I saw nobody to talk to about it. No, it came back to me, I thought a great deal over it, got to studying about it, laying at nights studying about it. * * * X. When did it first come to your mind that you did make an appraisement? A. I don't know. I got to studying about it after I met Mr. Craven here, but I don't know when it was done. X. When, to the best of your knowledge, was it you met Mr. Craven here? A. It has been two years ago anyhow, I think. I have never been here since, I know. * * * X. You, at first, told Mr. J. Frank Biggs that you didn't appraise them? A. And I told Tom Craven so, too. I told you awhile ago I intended to write to Tom afterwards, but I didn't. I thought I would see him at some time and tell him if it was very necessary. * * * R. Q. Why did you intend, and for what purpose did you intend, to write to Mr. Craven? (Objection.) A. Because I had told him I didn't know anything about it. R. Q. After you had told him that you knew nothing about it did you recollect the circumstances before you saw me [Mr. Marvel] in the fall of 1911? A. Yes, sir. I intended to write. I wanted to explain it, to rectify the mistake I made. * * * R. Q. What mistake? A. I told him I didn't ever have anything to do with it, didn't appraise the property, that I didn't know anything about it, and I wanted to tell him that I had had."

The manner in which Lynch, notwithstanding his advanced age, stood the long and wearying cross-examination to which he was subjected, affords persuasive evidence of his intelligence and truthfulness. During his cross-examination he was confronted with what purported to be an affidavit made by him before Charles K. Lloyd, notary public, September 2, 1908, stating that he did "not recollect of ever appraising or putting a valuation upon the 'Capelle Farm' or 'Homestead Farm' or any other real estate devised under the last will and testament of Thomas Jamison," and that "to the best of his knowledge and belief, the said farms and real estate never were appraised or valued by him; and that he never acted in the capacity of appraiser of, or put a value

upon, any of the real estate of Thomas Jamison, deceased, under the instructions" of his will. I do not attach much importance to this paper for several reasons. In the first place, Lynch positively denied making such affidavit, and testified to the effect that he was sure that if he executed it he was not in a condition to do it. The notary before whom Lynch subscribed his name was not produced as a witness nor his absence accounted for; nor the draftsman of the paper, nor the person or persons who induced Lynch to sign it, nor any one to state the circumstances under which he signed or his condition at that time; and there is no attempt whatever to account for the failure to adduce such evidence. Further, as has already appeared, Lynch had virtually forgotten the transaction of the appraisement, and did not recall it until about two years before giving his testimony in 1912. Again, no witness has been produced to assail Lynch's veracity or integrity. Still further, he was declared by Clarence, Edgar and Oliver in the written request to Craven to appoint appraisers to be one of the "substantial men of the neighborhood." And the fact that Edgar had sufficient confidence in his character and ability to appoint him, November 28, 1883, trustee for the discharge of important and delicate trusts and discretionary powers (Defendants' Exhibit No. A–9), is evidence that he was regarded as a man of judgment, integrity and discretion. And finally, Lynch is corroborated as to the making of an appraisement of the three farms shortly after Oliver attained his majority by an overwhelming weight of evidence both documentary and oral. Oliver Jamison testified as follows:

"Q. Did Thomas J. Craven, as executor and trustee under your father's will, have the farms appraised and a valuation placed upon them after you became twenty-one years of age? (Objection.) A. He did. Q. Who were the appraisers selected by Thomas J. Craven to place that valuation? A. William M. Stuckert, John P. Hudson and Purnal J. Lynch. Q. What valuation, Mr. Jamison, if you know, did they place upon the Homestead Farm? (Objection.) A. Twenty-two thousand dollars. * * * Q. What valuation did they place upon the Capelle farm? (Objection.) A. Fourteen thousand dollars. * * * Q. What valuation did they place upon the Jamison Corner farm? (Objection.) A. Twelve thousand dollars. Q. When was this done? (Objection.) A. Soon after I became of age. * * * Q. Were Purnal J. Lynch, William M. Stuckert or William H. Stuckert, whichever you have it, and John P. Hudson, substantial men of the neighborhood at that time? A. They were considered three of the best men in the neighborhood. Q. They lived in the locality of the farms? A. Yes, sir; all their lives, I guess. Q. After the appraisement was made and the valuations were placed upon the farms, was the interest coming to Edgar, under your father's will, paid to Edgar after that time? (Objection.) A. Yes, sir. * * * Q. Mr. Jamison, was the interest paid to Edgar on his share as found by the valuation and apportionment? A. It was."

Oliver's testimony as to the appraisement of the farms has been assailed or criticized because he stated on cross-examination that he was not present with Stuckert, Lynch and Hudson at the time he says they made the appraisement and did not see it actually made. But such objection to the evidence given by him is not sufficient to avail against his positive statement that an appraisement was made by the three men named resulting in a valuation of $22,000 for the Homestead farm, $14,000 for the Capelle farm, and $12,000 for the Corner farm;

for the reasons that on the written request of himself and his two brothers Craven appointed the three appraisers, and they met presumably pursuant to their appointment, as testified to by Oliver, and that he subsequently, as he testified in effect, made settlements with Edgar Jamison upon the basis of a valuation of the testator's real estate in accordance with an appraisement as stated by him. The testimony of Oliver on cross-examination powerfully supports and corroborates his statement given in chief, and also the testimony of Lynch that the three farms were appraised at $22,000 for the Homestead farm, $14,000 for the Capelle farm, and $12,000 for the Corner farm, aggregating $48,-000. It appears from the evidence, and is not disputed, that at and prior to the time of the appraisement, through the sufferance of Craven, Oliver had entered into possession of the Homestead farm, Clarence of the Capelle farm, and Edgar or his representative of the Corner farm. While Oliver in his direct examination had testified to the effect that interest was paid by him to Edgar on his share as found by the appraisement, there was no statement of the amount of the interest so paid. But on cross-examination he testified to the effect that owing to the difference in the appraised value between the Homestead farm and the Capelle and Corner farms, he paid interest to his brothers on the sum of $6,000. The total valuation of the three farms being $48,000, and the Homestead farm having been appraised at $22,000, Oliver was in the enjoyment of real estate worth $6,000 more than the equal third part of the total valuation of the three farms, namely, $16,000. The addition of $2,000, parcel of this $6,000, to the $14,000, representing the appraisement of the Capelle farm, and of $4,000, the remainder of the $6,000, to the $12,000 representing the appraisement of the Corner farm, exactly equalizes the shares of the three surviving sons of Thomas Jamison, and accordingly Oliver paid to his brothers the exact amount necessary to equalize the three shares so far as beneficial enjoyment was concerned, on the basis of an aggregate valuation of $48,000 of which $22,000 represented the Homestead farm and the payment of interest on $6,000 to his two brothers is potent evidence against any other valuation than that testified to, not only by Oliver, but by Lynch, the only surviving appraiser. Edgar, Clarence and Oliver having, November 18, 1878, joined in the written request to Craven for the appointment of appraisers to value the three farms in question, the fact that they united December 15, 1879, shortly before he moved to New Jersey in a written statement (Defendants' Exhibit H) that he had "duly proceeded in the execution of the said will, and of the trusts therein to him confided," necessarily carried with it, in the absence of any evidence showing or tending to show any change of view on their part with respect to the desirability of an appraisement of the three farms, a strong presumption that he had caused an appraisement and valuation to be made as requested. That there was an appraisement of the three farms shortly after Oliver attained his majority has been established beyond question, by documentary as well as oral evidence, and both Lynch and Oliver agree as to the amounts at which the three farms were respectively valued. No witness has been produced to show that the valuation made by the three appraisers was other than

that stated by the witnesses for the complainants, namely, $22,000 for the Homestead farm, $14,000 for the Capelle farm, and $12,000 for the Corner farm. The loss or destruction of the written embodiment of the results of the appraisement cannot serve to defeat a just demand of the complainants based upon such results. It was the duty of the trustee before he withdrew from and abandoned his trust to obtain and preserve for the protection of the interests of the surviving children or issue of Edgar durable evidence of the values placed upon the farms by the appraisers acting under his appointment; and his non-feasance in that respect cannot be permitted to prejudice the rights of the beneficiaries of the trust. Attention is drawn by the counsel for the defendants to the fact that Oliver, in a verified petition (Defendants' Exhibit E–E) to the Chancellor for leave to borrow $303.56 on the security of the Homestead farm, stated that it had been appraised at $18,000. In view of the relatively small amount he wished to borrow, so far as the granting of his application was concerned, it was wholly immaterial whether the farm was worth eighteen, or eight, or twenty-eight thousand dollars, and consequently there was not the same probability that, after the lapse of ten years from the making of the appraisement, the actual amount at which it had been appraised would be as clearly recalled by him as if the 'margin between the value of the farm and the amount to be borrowed had been comparatively slight. He evidently relied upon the draftsman of the petition for he says, "I don't know that I read that affidavit over." Certainly the circumstances were not such at the time of the presentation of the petition as to recall so clearly to Oliver's mind the amount of the appraisement as the payment out of his pocket of the interest on $6,000, as to which he was interrogated during his examination, in order to equalize the shares of the surviving sons, which payment is practically inexplicable on any other assumption than an appraisement as testified to by both Lynch and himself. It satisfactorily appears from the documentary as well as the oral evidence that there was not at the time of the appraisement of the three farms, nor thereafter, any personal estate applicable to the share designed by the testator for the benefit of Edgar Jamison and his children or issue. Consequently, as the real estate was the only fund to answer the purpose of the trust after Oliver attained his majority, $16,000, being one-third of the total value of the three farms, was intended by the testator to be raised out of or charged upon them for the benefit of Edgar Jamison and his children or issue.

If Albert had lived the $4,000 charged upon the Corner farm would have been added to the amount of the appraisement of the Homestead and Capelle farms for the purpose of the equalization and apportionment of the shares of Edgar, Clarence and Oliver. But the above sum of $4,000 was not so added, for the reason that owing to Albert's death during the life-time of his father the Corner farm was included in the appraisement, and thus it was immaterial whether that farm should be included without the charge upon it, on the one hand, or, on the other, subject to such charge, as in the latter case the amount of the charge would necessarily be added to the value of the farm less the charge.

It has been urged that as the trustee was obliged "to raise out of or charge upon" the farms the sum or sums of money necessary to equalize the shares of Edgar, Clarence and Oliver only upon the attainment of the age of twenty-one years by the youngest son who should live so long, no charge or liability of any kind for the $16,000, representing the share of Edgar and his children or issue, or any part of it, could attach to the land before that time. But this position is untenable. There was from the testator's death an equitable charge on the farms for the whole or such portion of Edgar's share as could not be paid out of the personal assets of the estate, although that charge was not and could not be ascertained in amount before the appraisement. The charge was a trust fastened to the land as a liability, for it was a trust to raise money out of it or charge money upon it. There was no gift of a legacy eo nomine. But this is unimportant. There was, not a discretionary power, but a mandatory provision that money should either be raised out of the land and invested for the benefit of the objects of the testator's bounty, or be charged upon it for their benefit. The testator had a clear intention that the land should be answerable for so much money as was directed to be raised out of or charged upon it, and that intention must control, in accordance with the principle enunciated by Chief Justice Marshall in Smith v. Bell, 6 Pet. 68, 8 L. Ed. 322, that "the first and great rule in the exposition of wills, to which all other rules must bend, is, that the intention of the testator, expressed in his will, shall prevail, provided it be consistent with the rules of law." In Colton v. Colton, 127 U. S. 300, 8 Sup. Ct. 1164, 32 L. Ed. 138, the court had under consideration the following provision in a will:

"I give and bequeath to my said wife, Ellen M. Colton, all of the estate, real and personal, of which I shall die seized, possessed, or entitled to. I recommend to her the care and protection of my mother and sister, and request her to make such gift and provision for them as in her judgment will be best."

It was held, reversing the lower court, that under the above provision there was a valid and enforceable trust in favor of the testator's mother and sister, although the language was a request to his wife, who was the devisee and legatee "to make such gift and provision for them as in her judgment will be best," and stated its conclusion as follows:

"On the whole, therefore, our conclusion is that each of the complainants in these bills [the mother and sister of the testator] is entitled to take a beneficial interest under the will of David D. Colton, to the extent, out of the estate given by him to his wife, of a permanent provision for them during their respective lives, suitable and sufficient for their care and protection, having regard to their condition and necessities, and the amount and value of the fund from which it must come. It will be the duty of the court to ascertain after proper inquiry, and thereupon to determine and declare, what provision will be suitable and best under the circumstances, and all particulars and details for securing and paying it."

In the course of the opinion the court said:

"The object, therefore, of a judicial interpretation of a will is to ascertain the intention of the testator, according to the meaning of the words he has

used, deduced from a consideration of the whole instrument and a comparison of its various parts in the light of the situation and circumstances which surrounded the testator when the instrument was framed. These rules of construction, indeed, apply to every written instrument, although in deeds and some other formal documents the long usage of the law has, in certain cases, required the use of technical words and phrases to accomplish particular effects. No technical language, however, is necessary to the creation of a trust, either by deed or by will. It is not necessary to use the words 'upon trust' or 'trustee,' if the creation of a trust is otherwise sufficiently evident. If it appear to be the intention of the parties from the whole instrument creating it that the property conveyed is to be held or dealt with for the benefit of another, a court of equity will affix to it the character of a trust, and impose corresponding duties upon the party receiving the title, if it be capable of lawful enforcement. No general rule can be stated that will determine when a conveyance will carry with it the whole beneficial interest, and when it will be construed to create a trust; but the intention is to be gathered in each case from the general purpose and scope of the instrument."

It is unnecessary to multiply authorities on this point. Colton v. Colton has often been cited with approval, but never, so far as I am aware, questioned or criticized by the Supreme Court. Nor have the principles of testamentary construction there enunciated failed of universal acceptance. But whatever may be thought of the sufficiency of the grounds disclosed in that case to support a trust, as distinguished from a discretionary power or an expression of mere hope or desire, all reasonable question is excluded here, as the direction to raise money out of the land or charge the same thereon is purely mandatory. In view of the form of language before the Supreme Court the complainants there obviously were in a less favorable position than the complainants here with respect to securing a judicial establishment of a trust.

The testator intended that in the fund provided for by him for the benefit of Edgar and his children or issue, Edgar should have a life interest and his surviving children or issue should on his death take absolutely the corpus or capital of the fund. The defendants, however, contend that an exclusive and absolute right to the fund vested in Edgar alone; that he executed a release to Craven as executor and trustee December 15, 1879, from all claims, suits and demands relating to the testator's estate, reciting that Craven had "fully accounted for and paid over all of the said estate to the parties entitled to receive the same, according to the provisions of the said will"; and that the complainants have no right or interest whatsoever in the charge, if one ever existed. In support of their contention the defendants have referred to Shelley's Case, and to the rule, that although that case bears upon estates of freehold and has no application whatever to personal chattels or estate, where personal property is bequeathed in language which if applied mutatis mutandis to real estate would expressly or by implication create an estate tail, it vests absolutely in the person who would be the immediate donee in tail and devolves, upon his death, upon his personal representative, and not upon his heir in tail (2 Jarm. Wills, 348), and to the provision in the will that "in case of the death of any of my said sons Edgar, Clarence and Oliver without leaving any child or children or the issue of such, the share of the one so dying shall go to the survivor or survivors,

and the issue of such as may be deceased," &c. And hence it is argued that the language of the will touching the limitation of the fund charged upon the farms would if applied to real estate create an estate tail by implication, and therefore that the sole and exclusive right to the fund charged upon the farms vested in Edgar. But this conclusion is palpably unsound. While the rule in Shelley's Case applies equally to equitable and legal estates it is necessary to its operation that the estate of the ancestor and the limitation to the heirs must be of the same quality, that is to say, both legal or both equitable. It has no application where the first estate is the subject of an active trust, and there is a limitation over of the estate discharged of the trust. Edgar's life interest in the trust fund to be raised out of or charged upon the farms was the subject of an active trust and on his death the corpus of the fund was to go absolutely and free from all trusts to his surviving children or issue. The trust was active, and not dry or passive during Edgar's life-time. Craven was "to invest all the rest and residue of my estate, not herein otherwise disposed of in bonds and mortgages as aforesaid, interest payable semi-annually, and keep the same so invested until the majority of my youngest son who shall live to attain the age of twenty-one years." And included in the trust is the provision:

"The share of the said Edgar shall be in money invested in good bonds and mortgages as aforesaid, the interest payable to him, after such apportionment semi-annually during his natural life and from and immediately after his death the principal and all interest accrued thereon payable to his child or children or the issue of such."

The general limitation over in case of the death of any of the testator's sons without leaving children or issue, above mentioned, cannot do away with the fact that there was an active trust during Edgar's life-time. It seems clear that Edgar was to have a life interest in the fund, and his children were to take by way of executory bequest upon his death. State v. Warrington's Ex'r, 4 Har. (Del.) 55; Jones v. Rees, 6 Pennewill (Del.) 504, 69 Atl. 785, 16 L. R. A. (N. S.) 734; Gross v. Sheeler, 7 Houst. (Del.) 280, 31 Atl. 812. The trust for raising or charging the fund was one of which not only Edgar but his surviving children or issue were the beneficiaries. The right of his children on his death to receive the fund ascertained by the appraisement representing his share of the testator's estate was not derived from Edgar, but directly from the testator. The latter intended that the income of that fund accruing during the lifetime of Edgar should be received and enjoyed by him, but he provided that the principal should on his death go to his surviving children or issue absolutely and free from any trust. This was the testator's plain, unmistakable intent as disclosed by the terms of the will. While Edgar might enjoy or otherwise dispose of his life interest in the fund, no act, consent or omission on his part, however meritorious his intent, could deprive his children of the bounty provided for them by their grandfather.

[3] The defendants place much reliance upon the sheriff's sale and deed under what is known as the Worth mortgage as a muniment of

the title claimed by them. The circumstances attending that transaction are as follows. The testator having provided guardianship for his children, but omitted to name a guardian, John P. Belville was on his own petition, February 20, 1865, appointed by the Orphans' Court for New Castle County guardian of Edgar, Clarence and Oliver, who at that time were infants under fourteen years of age. Belville after his appointment as guardian entered upon and continued in the exercise of that office. Subsequently, in or about February, 1874, Craven presented a petition to the Chancellor of Delaware, setting forth in substance that by the will real estate of the testator, consisting of the three farms in question, was held by the petitioner in trust for the three minor children, Edgar, Clarence and Oliver; that the net rents of the farms were not at that time sufficient "comfortably to board, clothe and educate the said minors"; that the guardian, Belville, was then in arrears with persons with whom he had contracted debts for the minors to the amount of $800 or more; that the petitioner did not then possess sufficient funds arising from the said estate to pay "the present liabilities on account of the said minors"; and that if he, Craven, "could be authorized to borrow as trustee under the will of Thomas Jamison a sum not exceeding twelve hundred dollars for a few years he thinks that then he will be able to pay the sum out of the increased rent of the estate, and that sum would now relieve the condition of the guardian and enable him to pay up the amount of the indebtedness against the said minors." Craven therefore prayed that the Chancellor "allow him to borrow upon the best terms he may be able, the sum of twelve hundred dollars, as trustee or in his own name for the use of the said trust estate with which to pay the liabilities now standing against the said minors for maintenance." On this petition the Chancellor, February 20, 1874, ordered that the petitioner be "authorized and empowered to borrow on account of the trust estate the sum of twelve hundred dollars for the period of three years, to be reimbursed by the rents and profits of the trust estate, and that the sum or so much thereof as may be necessary, be applied to the payment of debts now accrued and unpaid for the support, maintenance and education of Edgar Jamison, Clarence Jamison and Oliver Jamison, the three minor children of Thomas Jamison, deceased, to be expended by their guardian, John P. Belville, who shall give receipts to the trustee for the same and be chargeable with it as for other moneys received on account of the said minor children." There was some contention between counsel whether the Chancellor signed or authorized the entry of the above order. If he did not, no order was made by him authorizing or attempting to authorize the trustee to borrow money for the above purpose. An order, however, in the above form was entered of record. Craven testified in substance that he was orally authorized by the Chancellor to execute a mortgage to secure the repayment of the sum to be borrowed. But on this point his testimony is loose and unsatisfactory, and in no aspect of the matter could serve to enlarge or in any manner modify the scope of his authority as evidenced by the recorded order of the Chancellor. The purpose of the trustee's

application was to get authority to borrow money, not only to provide for future education and maintenance, but to "relieve the condition of the guardian and enable him to pay up the amount of indebtedness against the said minors." Craven purporting to act as trustee executed, April 10, 1874, a mortgage of the three farms in fee to Worth to secure the payment of $1,200 on or before April 10, 1877, it being recited in the mortgage that on account of the trust estate he "was authorized by a decree of the Chancellor of the State of Delaware to borrow the sum of twelve hundred dollars as by the said order made February 20th, A. D. 1874, and recorded at New Castle in Chancery record Book D, page 493, will more fully appear." On the assumption that the Chancellor possessed power or jurisdiction to make the order of February 20, 1874, the authority conferred by it upon Craven was strictly limited to the borrowing of the sum therein mentioned upon the credit of rents and profits of the farms thereafter to be received, and did not extend to the pledging or mortgaging of the principal or corpus of the real estate in fee. There is not a word either in that order or in the petition on which it was made pointing to the execution of a mortgage in fee. In the absence of authority conferred by the will it is impossible, I think, to support the order under any construction which would extend it to the execution of a mortgage in fee. Certainly neither the Orphans' Court nor the Chancellor by virtue of its or his statutory jurisdiction was empowered to make an order having such operation. The following statutes of Delaware were in force at the time the Chancellor made the order, namely:

Section 17 of chapter 96 of the Revised Code, entitled "Of the Orphans' Court," providing as follows:

"Sec. 17. The court may direct a guardian to expend a specified sum in the maintenance and education of his ward, or the repair, or improvement of his real estate; and may also direct such portion of the wood, or timber, growing upon the land of the ward as may not be necessary for the use of the same, to be cut and sold for the same purpose. Without such directions, a guardian shall not be allowed to exceed the clear income of the ward's estate."

And section 2 of chapter 78 of the Revised Code, entitled "Of Guardians and Wards," providing, among other things, as follows:

"Sec. 2. A guardian shall have the care of his ward's person, and the possession and management of his real and personal property; and shall have authority * * * to sell personal property of the ward of a perishable nature; and also, by leave of the Orphans' Court, to sell any other property."

Authority "to sell any other property" in this connection is restricted to any other property of the ward. Edgar, Clarence and Oliver had not, nor had any of them, either at law or in equity, any right or interest in or claim to the principal of the fund which the testator intended and provided should go to the surviving children or issue of Edgar Jamison. Under the will neither Clarence nor Oliver had any right to the income of that fund during the life of Edgar, for such income was given to him, and not to them, during his natural life; and equally, neither Edgar Jamison nor either of his two brothers

had any right to the principal of the fund after Edgar's death, for it was given by the testator, not to them or any of them, but to Edgar's children or issue. The principal of the fund being limited to Edgar's children or issue on his death could not be directly or indirectly appropriated by any court for the maintenance and education of the testator's children (Perry on Trusts, § 619), whatever might be the power of the court to order a sale subject to such trust, charge or liability touching the principal. In Stephens v. Howard's Ex'r, 32 N. J. Eq. 244, it was held that the court of chancery had power to apply a part of the principal of a legacy in advance of the time fixed by the will for its payment, for the support of infant legatees. But the decision was based upon the ground that the legatees were under the will wholly and solely entitled to the principal as well as the interest. The court said:

"Their title to the subject of the gift is as perfect now as though the right to it had been cast upon them by the statute of distribution, but they have no right to present payment; on the contrary, the testatrix has very plainly said that they shall not be paid now, but at a future time. The question is one of power. Has the court power to direct the payment of these legacies in advance of the time fixed by the will? As a general rule, courts are just as much bound by the terms of a will as are the beneficiaries under it—it is a law unto them as well as unto the legatees. * * * The source of the power it is easy to trace. It is found in the fact that the infant is the absolute owner of the property, no other person having either a present or prospective legal interest in it," &c.

If the Orphans' Court could not have made a valid order for the mortgaging in fee of the farms in such manner that they could be sold under the mortgage free and discharged of the trust or charge in favor of the surviving children or issue of Edgar, a fortiori the Chancellor lacked that power in the absence of authority in that behalf conferred by the will. The proviso to section 1, chapter 95 of the Revised Code, entitled "Of the Court of Chancery," conferring jurisdiction upon that court, declares, among other things, that "the Chancellor shall not have power to determine any matter wherein sufficient remedy may be had by common law, or statute, before any other court, or jurisdiction, of this state." Jurisdiction over the application of minors' property to their maintenance and education is, in the absence of a valid trust to that end, committed by statute to the Orphans' Court, and hence does not fall within the jurisdiction of chancery. The latter court "could not order a sale for the purpose of paying the debts; there being for this a provision, made by statute in another jurisdiction, the Orphans' Court," &c. Rambo, Ex'r, v. Rumer, 4 Del. Ch. 9, 15. So, for precisely the same reason, in the absence of a provision in the will authorizing it, the Court of Chancery had no power to direct the sale or disposition of any portion of the rents and profits or corpus of the farms or any interest therein for the education and maintenance of the minor sons of the testator. From these considerations it follows that whatever power the Chancellor had to make an order for the application of the trust estate or its income to the maintenance or education of Edgar, Clarence and Oliver, or any of them, originated in and was restricted by the terms of the trust cre-

ated by the will. No language was used by the testator to support an implication of power on the part of the guardian or trustee to dispose of the corpus of the land in the event of an insufficiency of rents and profits for the maintenance and education of Edgar, Clarence and Oliver. On the contrary the language of the testator is such as to exclude such an idea; for he provided, not that a specified sum or an amount sufficient for maintenance and education should be raised out of rents and profits, but merely that the rents and profits, and the interest on all sums invested as in that item prescribed, and "so much thereof as shall be necessary" should be expended for that purpose, and further, that the residue, if any, be "invested for their benefit, first deducting yearly a sum not exceeding one hundred and fifty dollars, to be expended on each of the said farms, to keep the same productive and in good condition." The testator in using the phrase "deducting yearly," which necessarily involves a yearly deduction, clearly contemplated a continuing receipt of rents and profits during a course of years, and excludes any idea that a sale or mortgage in fee of the premises was authorized by the testator in connection with the maintenance and education of his three sons. Further, any idea that, although the sum of $150, to be yearly deducted, was to be expended on the farms to "keep the same productive and in good condition," the testator intended that the farms might be alienated and lost to his family through a sale or mortgage of the fee, is wholly inadmissible. Hence it is clear that the Chancellor had no power on the petition of the trustee to authorize the sale or alienation, directly or indirectly, of any property not belonging to the wards or any of them, namely, the corpus or principal of the fund directed to be raised out of or charged upon the farms, on the attainment of his majority by the testator's youngest son who should live so long, for the benefit of Edgar's children or issue, for the purpose of enabling the guardian to provide for the maintenance and education of Edgar, Clarence and Oliver, or to reimburse either the trustee or guardian for moneys expended for that purpose. As any order to that effect would have been unauthorized and void, the Chancellor, in directing the reimbursement out of rents and profits, recognized a restriction which the circumstances of the case rendered essential to a valid exercise of his jurisdiction.

The trustee having procured the order of February 20, 1874, executed without authority, April 10, 1874, to Bently Worth a mortgage in fee covering the three farms, which only some four years afterwards were appraised and valued at $48,000, in the aggregate, to secure the payment of the sum of $1,200 mentioned in the order, in three years, with interest payable semi-annually. There were some peculiar or unusual incidents connected with the Worth mortgage transaction. Action was brought on it by Worth April 26, 1880, against Craven as trustee, and the defendant failing to defend or appear in the suit judgment was obtained May 31, 1880, for $1,200, together with interest from October 12, 1879. From this it would appear that the semi-annual payment of interest which fell due last before the bringing of the suit had been paid. Craven, who removed to New Jersey at the beginning of February, 1880, states that he was not served with process

in and had no knowledge of the suit or of the judgment therein until long afterwards. The return on the writ of scire facias, however, was "Made known to Thomas J. Craven, Trustee under the last will, &c., of Thos. Jamison, Dec'd, and William H. Barnett, Oliver Jamison and Clara Jamison personally May 15, 1880." William J. Eliason states that he, acting as deputy sheriff of New Castle County, personally served Craven with process. Be that as it may—and I attach little, if any, importance to the point—execution process issued October 8, 1880, and it appears that the sheriff sold, November 1, 1880, the Corner farm to Edgar for $500, the Capelle farm to Clarence for $500, and the Homestead farm to Oliver for $500. At the time suit was brought on the mortgage the three sons were all of full age, and the appraisement of the three farms had been made as provided in the will. The $1,500 representing the aggregate amount at which the farms were struck off at the sale was slightly in excess of the $1,200, principal of the Worth mortgage, together with interest and costs. Sheriff's deeds were executed in December, 1880, to Edgar, Clarence and Oliver for the three farms respectively. The circumstances under which Craven executed the mortgage to Worth, the fact that all of the farms which had been appraised and valued at the sum of $48,000 were sold under a mortgage of only $1,200, and the manner in which the farms were bought at sheriff's sale, point unmistakably to some arrangement between Worth, and Edgar, Clarence and Oliver for the accomplishment of some purpose other than the mere collection by Worth of the amount loaned to Craven on account of maintenance and education. Oliver states positively that there was an agreement between himself and his brothers and Worth with respect to a sale of the farms under the mortgage; that it was "an agreement for Bently Worth to foreclose his mortgage and give us a clear title to the property. Edgar wanted the Corner farm and he got the Corner farm after the sale, and Clarence got his and I got mine. It was done merely to give us a clear title to the property"; that in the purchase of the three farms at the sale under the Worth mortgage no money was paid to the sheriff or to Worth in any way; but that after the sale Edgar, Clarence and Oliver borrowed some money from Worth and paid the purchase price. It does not appear that Worth at the time of the sheriff's sale under the mortgage was in any pressing need of the mortgage money. The contrary may be inferred; as the evidence is to the effect that he did not exact payment until some time had elapsed after the sale. Further, at the time suit was brought on the mortgage the three sons were all of full age, as before stated, and chargeable with knowledge of the contents of their father's will, and, from the evidence, documentary as well as oral, knew of the appraisement and valuation of the farms. They knew or were chargeable with knowledge of the provision that "the share of the said Edgar shall be in money invested in good bonds and mortgages as aforesaid, the interest payable to him, after such apportionment, semi-annually during his natural life and from and immediately after his death the principal and all interest accrued thereon payable to his child or children or the issue of such." It is a noticeable fact that Catharine, Edgar's eldest daughter, had been born February

2, 1878, and Vesta, his younger daughter, December 17, 1879. It is also noticeable in this connection that Craven states in his answer that after the appraisement of the farms Oliver, Clarence and Edgar "mutually agreed, as a convenient method of securing the benefits provided for them under the will of their father * * * each to take one of said farms so appraised as aforesaid, and to enjoy the same as life tenants thereof"; and that "under said family settlement" Edgar was to have the "income and benefits" of the Corner farm; and further, that Craven testifies that he had been advised by his counsel in 1879 with respect to an arrangement between Edgar, Clarence, Oliver and Craven, under which the three sons were to possess and enjoy the respective farms, that they "had a life estate in these farms, and Edgar could take the Corner farm, but he couldn't spend it." There is no evidence that at the time judgment was rendered on the Worth mortgage Edgar, Clarence and Oliver were unable or thought themselves unable to pay the amount of the indebtedness on account of their maintenance and education; and, in the absence of such evidence, to assume that they, the beneficiaries to so large an extent in the trust of the three farms, of full age, and with such an indulgent creditor as Worth to deal with, were unable to raise a little more than $1,200, is too severe a tax even upon credulity. I am unable to reconcile the conduct of Edgar, Clarence and Oliver in connection with the sale under the Worth mortgage with either an intention or a desire on their part that the provisions of the will in favor of Edgar's surviving children or issue should be carried out. Their action, under the circumstances then existing, rather indicates a purpose on their part to promote their own interests, regardless of the rights of such children or issue.

Much reliance is placed by the defendants upon the case of Jamison v. McWhorter, 7 Houst. (Del.) 242, 31 Atl. 517, decided June 3, 1885. It was a "case stated on questions reserved by the Superior Court for New Castle County." The action was brought upon an agreement between Clarence and Leontine J. McWhorter, whose brother married one of Clarence's sisters, for the sale and conveyance of a part of the Capelle farm by the former to McWhorter. McWhorter refused performance on his part on the ground of insufficiency of title. The case is incorrectly reported; for it is made to appear that Judge Houston, who delivered the opinion of the court, dissented, and that Chief Justice Comegys, who dissented, delivered the opinion of the court; and it also appears that there is no syllabus representing the opinion of the court, and the only printed syllabus represents the dissenting opinion of the Chief Justice. Nowhere in the case is anything said touching the effect of the provision in the will directing an appraisement of the farms. It appears, however, from the report that the counsel for the plaintiff made the statement that it was "admitted that the trustee has performed the duties specifically enjoined upon him"; and that "the trustees took the estate to manage until the majority of the youngest child, then to raise a charge upon the same for the purpose of equalizing the property," etc.; and that "the youngest child came of age May, A. D. 1878"; and that "it is confidently assumed that when the youngest child arrived at majority, and the

duties of the trustees had been performed," &c. These circumstances afford strong grounds for an inference that the court was led to believe that there was sufficient personalty in the estate to equalize the shares without raising anything out of the real estate or, on the other hand, that the shares had been duly equalized by the trustee pursuant to the provisions of the will. The principal question in the case was whether Clarence took an estate tail under his father's will, or a life estate with remainder in fee to his children or issue. The effect of the sheriff's sale under the Worth mortgage was also alluded to more or less incidentally. Judge Houston in the course of the court's opinion used the following language:

"In the view which I have taken of the question already considered and disposed of by me, it is not for me to enter into the consideration of the remaining question as to the title conferred on the purchaser by the sale under the mortgage given by the trustee pursuant to the order of the Chancellor, but if it were necessary for me to consider and decide that I should be obliged to hold under the facts and circumstances of this case that the mortgagee had a legal right to execution and sale on the mortgage at any time after the failure of the trustee for three years to pay it, and being seized as such of the legal estate in the premises when he so mortgaged them by the authority of the Chancellor, the purchaser took the legal title to them at the sheriff's sale upon it."

This expression of the learned judge was purely dictum. He expressly refrains from deciding the point, although he indicates what his opinion would be "if it were necessary for me to consider and decide." The case could not have been decided on the two grounds as they were mutually exclusive of each other and could by no possibility co-exist. If the sheriff's sale under the Worth mortgage was effectual it conveyed a fee simple title to the grantees and there could have been no question of an estate tail left for the decision of the court. The fact that the court decided there was an estate tail excludes all idea that there was a fee simple title under the sheriff's sale. As opposed to the dictum above referred to is the language of the Chief Justice who said:

"With respect to the question of title acquired by Clarence Jamison under the sale by the sheriff in execution of the mortgage made by the trustee under the order of the court of chancery of New Castle County—there does not appear to be in the will of the testator any authority to make a mortgage of the premises to raise money for the maintenance and education of the testator's sons; nor was there any, as it appears to me, in the said court to make such order. The whole proceedings for sale of the Capelle Farm, therefore, appear to have been without authority."

The ground of the decision appears on its face. It was that "under the provisions of the will of Thomas Jamison, Clarence Jamison as devisee therein took an estate tail in the premises devised in trust for him." This of necessity refutes the contention that the decision was based in whole or in part upon the ground that the sheriff's sale under the Worth mortgage conveyed the fee or had any efficacy. After the above decision was made the action of Edgar, Clarence and Oliver with respect to the transmission of title to the three farms was predicated solely upon the assumption that they were tenants in fee tail. They and their wives executed June 29, 1885, a deed to John F. Biggs

for the purpose of barring the supposed entail, in which it was recited that "it is desired to bar the said entails so that the said Clarence Jamison shall hold the said 'Capelle Farm' hereinafter described in fee simple, and Oliver Jamison shall hold in fee simple the 'Homestead Farm,' and Edgar Jamison shall hold the 'Jamison Corner Farm' in fee simple." And the several reconveyances by Biggs to Edgar, Clarence and Oliver of the same date equally recognize that they were executed for the same purpose. Neither in the deed to Biggs nor in the deeds from Biggs is any reference made to the sheriff's sale or deed under the Worth mortgage, but all of them recite or expressly recognize that the three sons were tenants in fee tail under the will—a position wholly inconsistent with the idea that they were tenants in fee simple under the sheriff's deed, and indicative of the fact that they placed no reliance whatever upon it. Catharine and Vesta were not parties to or represented in the case of Jamison v. McWhorter, and were in no sense bound by the decision. Nor was that isolated decision of such a character as to establish a rule of property. No single decision could have that effect aside from its soundness. The court seems to have given no consideration to the fact that the farms were held by the trustee upon an active "trust, to rent the same to good and careful tenants at the best cash or share rents attainable, as in their judgments shall be most advantageous, and to collect, expend and invest the same as hereinafter provided, until the majority of my youngest son who shall live to attain the age of twenty-one years," &c.; nor to the question how far the active nature of the trust during a portion of the life-time of the testator's sons would not at least during that period prevent the uniting of the legal remainder over with the life interest under the rule in Shelley's Case; nor to the question whether, if an estate tail was created by the testator, it must not have existed from the time of the speaking of the will, and if so, how it was that what was not an estate tail at the time of the testator's death became such during the lifetime of his sons on the attainment by Oliver of his majority; nor to the question whether the testator in providing that in the event of the death of any of his sons "without leaving any child or children or the issue of such, the share of the one so dying shall go to the survivor or survivors, and the issue of such as may be deceased," did not in view of his express mention of "child or children," contemplate a failure of children or issue living at the time of the death of the son entitled to such share. In Daniel v. Whartenby, 17 Wall. 84 U. S. 639, 21 L. Ed. 661, which was an action of ejectment for the recovery of lands in Delaware, the court, referring to cases relating to the creation of estates tail by implication or otherwise than by express use of the term, said:

"In this class of cases in the English courts the doctrine of Shelley's Case is applied unless there are circumstances which clearly take the devise out of of that rule. Every doubt is resolved in favor of its application. Here, we think, the tendency should be otherwise."

But whatever may be thought of the soundness of the holding in Jamison v. McWhorter, it is wholly unimportant so far as the rights of the surviving children of Edgar are concerned whether Clarence

228 F.—24

and Oliver took under the will a fee simple estate in the three farms, or an estate tail, or a life estate with remainder to their children or their issue; for whatever their estate, the farms were charged with the amount of the share, so far as unpaid out of the personal property, ascertained by appraisement as directed in the will, of which the income was to be received by Edgar during his life and the principal by his surviving children or issue. If it be assumed that Clarence and Oliver took an estate tail, while the entail could be barred under the laws of Delaware, the fee simple into which it was converted would still remain subject to the charge, that charge being wholly unaffected by the change. Clarence and Oliver took their respective shares, whether legally or equitably, expressly "subject to such charge." There was no claim, demand or interest in the estate paramount to the charge. All the debts of the testator had been fully paid and there was nothing which could support any jurisdictional action by a court calculated to destroy or injuriously affect the rights of Edgar's children in the charge or incumbrance intended for their benefit. Edgar, as already stated, died May 1, 1886, Catharine then being eight years and three months old, and Vesta six years and four and one-half months. Craven's accounts, remaining of record in the office of the register of wills for New Vastle County, show that at, before and after the time Oliver became of full age; and when the appraisement was made, there was no money or personalty of the testator applicable to the share intended for Edgar and his surviving children or issue. Thus Catharine and Vesta immediately on the death of their father became absolutely entitled under the will of their grandfather and the appraisement made pursuant to its provisions, to receive, in equal shares, the sum of $16,000, being the one-third part of the total valuation of the farms, and being the sum to be raised out of or charged upon them for the benefit of Edgar during his life and after his death for the benefit of his surviving children or issue. That sum was the amount of the charge upon the land in question; and there was a right, wholly beyond control, alienation or release by their father, vested in the two children, to receive and enjoy it. The trustee did not raise or charge the above mentioned sum or any part of it in accordance with the directions of the will. But this omission on his part could not destroy the rights of the children. Notwithstanding such omission, the charge, by virtue of the will and the appraisement, coupled with the absence of personalty applicable to it, existed at the time of the death of Edgar, and was enforceable by them or somebody authorized to represent them in that behalf.

It is contended by the defendants that on the assumption that Catharine and Vesta had a right on the death of Edgar to proceed for the enforcement of their claim of $16,000, there has been such laches on their part as to bar any equitable remedy. But on careful consideration of the evidence I am unable to reach such a conclusion. Until within two years next before the bringing of this suit they were in total ignorance of their rights under the will of their grandfather and the appraisement of the farms made pursuant thereto; nor until that time had either of them constructive notice of those rights or any in-

formation which reasonably should have put them, or either of them, upon inquiry. Catharine states in substance that at the time of the death of her father she was living with her mother in St. Georges, Delaware, which was also the place of residence of her father; that after his death she lived in St. Georges with her mother and sister about three years; that then she went to Newark, Delaware, and lived with Mrs. Lyle, her mother's mother, for two years; that then she went to Elkton, Maryland, where she lived for five years; that she married George F. Mathieson, one of the complainants, in 1896; that she was working in the Felton House, in Elkton, doing "upstairs work" when she was married; that she continued to live in Elkton about three years after her marriage; that she then went to New York where she lived for a few months; that she then went to Chicago where she lived for a few months; that she then went to St. Louis where she and her husband had their home for about six years; that then they went to Nelsonville, Ohio, where they lived one year and two months, until April, 1907; that they then moved to Philadelphia, where they have since resided; that since her father's death she has very seldom communicated with her mother; that after moving to Elkton she did not revisit Delaware for about eighteen years; that since her father's death, with the exception of Oliver, her uncle, she has never seen any of her father's relatives; that she has never seen Oliver since leaving Delaware; that she didn't see much of her mother; that her mother "seemed to think we had our living to make, and she was employed all the time, and she never had time to visit us. * * * The same way with me: I didn't have time to visit her"; that she and her mother wrote to each other from time to time at irregular intervals; that neither of her uncles Clarence and Oliver ever wrote to her; that she "never received a letter from any of my father's people. They have all just been strangers to me"; that she never thought much about her father's people; that "they never seemed to take any interest in us, and I never thought of them. If I wanted a favor I always went to strangers"; that she first learned that she had an interest in her grandfather's estate in 1905; that in 1904 she received a small sum of money from Biggs, who stated that it was her share of the estate of her grandfather; that she and her sister talked it over and decided to see counsel; and that in 1905 they got a report from their counsel that their grandfather left a will in which provision was made for them; that that was the first time she ever knew or heard of a will made by her grandfather; that neither her father nor mother nor any of her relations had ever given her any information on the subject, and that she has never in any manner released or abandoned her interest under the will. Vesta states in substance that none of her father's brothers since his death ever wrote to inquire for or visit her mother, her sister or herself; that she first learned in 1905 that the testator left a will; that in 1904 she received a letter from Biggs to the effect that there was a small amount of money representing her share from a strip of land; that "then I thought about it, and I talked with my sister, and wrote to my sister, and we thought that there ought to be more, and we inter-

viewed our counsel"; that "in 1905, we learned that my grandfather had left a will"; that before 1905 she did not know that he had left either a will or any estate or property of any kind; and that she communicated to·her sister, Catharine, the contents of a letter dated October 20, 1904, received from Biggs. The above letter produced in evidence by the witness (Complainants' Exhibit No. 15) is as follows:

"Wilmington, Del., Oct. 20, 1904.

"Mrs. Vesta Jamison Bastian
    "809 Buttonwood St. Phila.
·"Dear Madam:
    "I am sorry not to have been at my office when you called. Please find inclosed herewith my check for $11.37 in payment of your share, less costs of satisfaction 25 cts. paid by me for you.

Statement

| | |
|---|---:|
| Am't of your share | $11.34 |
| Int. from May 18 to Oct 18 | .28 |
| | 11.62 |
| Costs | .25 |
| | $11.37 |

"I have written to your sister at 2740 Grand Ave. St. Louis, Mo., and presume that she will not come here for so small an amount, but will execute a power of atty. for me to receive the money and satisfy the record. You might tell her that you have gotten your share and that I am ready to pay her. The purchaser paid $11.34 into court, and your mother will be entitled to the interest on that sum while she lives and at her death it would go to the heirs at law of Edgar Jamison. You and your sister will get it at her death if you are living; it being the dower interest of.your mother.
    "Yours truly                              J. Frank Biggs."

There is no oral or documentary evidence in the case in any respect contradicting or weakening the testimony of Catharine and Vesta that they were wholly ignorant and uninformed as to their rights under the will of their grandfather until 1905. On the contrary, their statements are corroborated and substantiated by both direct and circumstantial evidence. George F. Mathieson states in substance that he first learned in 1904 of the claim set up by his wife; that she got a letter from Wilmington in which there was a check for eleven dollars and some odd cents; that "we had a little talk about it and I said there must be something back of that. So she consulted a lawyer and then she found out that there was something back of it"; and that it was in ,1905 that he learned of the interest of his wife in her grandfather's estate. Mrs. Jamison, Edgar's widow and mother of Catharine and Vesta, states in substance that she knew that Thomas Jamison left a will; that she had never seen it and did not.know its contents; that her husband never talked to her about it; that she never knew that her two daughters or .either of them had any interest in the estate of the testator; that she never told or discussed or talked to them about any interest they might have under his will; that she thought she and her children had an interest in the Corner farm of which Oliver had possession; that she looked to Oliver for her living from that farm; and that she had told her children that "we had the farm,"—referring to the Corner farm. One naturally would

suppose that information, if any, which they might have received touching their grandfather's estate and the appraisement of the farms and their interest in the charge thereon, after the death of their father, would have come from Craven who caused the appraisement to be made, and knew or should have known of their existence before removing to New Jersey in February, 1880, and was chargeable with knowledge of their rights, or from their father or their uncles, Clarence and Oliver Jamison. But it does not appear that any of them dropped a single word to these minor children or to anybody representing them to apprise them of their rights. Oliver Jamison states in substance that he as trustee of the Corner farm paid the rents and profits after the death of Edgar for about three years to his widow, the farm thereafter being sold under a mortgage; that he never informed Catharine and Vesta, or either of them, of the provisions in the will in their favor, or any other provision it contained; that they never inquired of him or made demand touching any claim or interest under the will; that he had never paid them any money or secured from them any release touching the provisions in their favor in that will; and that he never saw or had any communication from them after they left Odessa, when, he supposes, one was about six, and probably, the other was seven or eight. John T. McWhorter, who married Laura Jamison, an aunt of Catharine and Vesta, stated in substance that after Edgar's death he lost sight of Mrs. Jamison and her two children; and that they never communicated with or visited his family, and no members of his family visited them. Margaret M. Jamison, wife of Clarence, stated in substance that since Edgar's death she had known little of his widow and her two children; that she does not know what became of them; and that they had not visited her family or in any way communicated with her or her family. Craven states in substance that his removal to New Jersey was about or a little after the time that Edgar was married; that there was no other property than the three farms in question to be divided between Edgar, Clarence and Oliver; that he had never as executor, trustee, or in any other capacity, raised out of the farms by lien or otherwise any sum of money to be held or set aside for the benefit of Edgar and his children; that he had never paid any money to such children; that he had never released or discharged the farms from any legacies which were or might have been charged upon them for Edgar or his children; that he never saw Mrs. Mathieson or had any communication with her; that she had never released or discharged him from raising anything that might be due to her out of the farms; that nobody had ever asked him whether money bequeathed under that will to those children had been paid; that he never made any inquiry prior to this suit whether Edgar had any children; that he never bothered himself in any way as to Edgar's immediate family; that after he moved from Delaware he never knew who owned the farms; that he never gave any notice to anybody, either the owners of the farms or otherwise, that there was any lien or charge of any kind upon the farms under the will; that he never gave notice to anybody that the personal property of the testator was not suffi-

cient to pay Edgar Jamison's share in money; and that he removed to New Jersey possibly six months after the appraisement by Lynch, Hudson and Stuckert was made.

The defendants examined certain witnesses for the purpose of showing statements by Catharine and Vesta and their mother indicating such knowledge or information on their part as to whatever rights the two daughters had under the will as to make them chargeable with laches in not sooner proceeding for the enforcement of such rights. The testimony thus adduced, however, falls far short of establishing knowledge or notice on the part of either of the daughters of the rights asserted in the bill in this suit, or of any matter or thing which could reasonably put them upon inquiry. Thomas J. Green, son of Sarah Eliza Green, states in substance that he knew Vesta when she was living with his mother in Odessa; that Vesta was eight or nine years old when she went to live with his mother, and continued to live with her about thirteen or fourteen years; that he lived there three or four years immediately after Vesta first went there; that when he left she was eleven or twelve years old; that he saw her during a period of five or six years after he ceased to live with his mother; that he heard Vesta say while he was living with his mother that "she had some money coming to her, if she wasn't cheated out of it," when she came of age; that "sometimes, if she had a right smart to do she would say to us boys, 'There will be a time, when I get my money, that I won't have to work so hard,' or something to that effect, you know. That is all I ever heard her say about it"; that he doesn't know how often she made a remark to that effect, but "I heard her say several times, like a small child, because she was nothing but a child then." Lettie V. Green, wife of the last mentioned witness, states in substance that she had Vesta as a pupil while she was teaching school at McDonough; that she began teaching there twenty years before testifying and continued to teach for a period of three years; that Vesta was then at the house of Mrs. Green, the mother of her husband; that during that period she had heard Vesta say that "she had been cheated out of money"; that she does not know that the remark related to her grandfather's estate; that she "heard her say that she had money coming to her that she had been cheated out of"; that "when she had work to do, and it was something she didn't want to do, she would say, 'I wouldn't have to do this if I hadn't been cheated out of the money that was coming to me'"; that Vesta did not tell her whether the money she referred to was "money from her grandfather's estate." Abraham S. Mote states in substance that he had known Josephine Jamison, the mother of Catharine and Vesta; that he made her acquaintance "a little past fourteen years ago, I judge"; that she lived at his house from April to September and in the following year probably three or four weeks; that he knew Catharine, who stayed at his house about five or six months; that Mrs. Jamison said "her daughter would be entitled to her father's share, but she was afraid they were going to cheat her out of it"; that he could not say whether Catharine heard this remark; and that he heard Mrs. Jamison make such a remark about two or three times.

Mary McCrea states in substance that she knew Catharine who fourteen years before the taking of testimony lived at the witness' home in Elkton; that she heard Catharine and her mother talking about money that she expected to get from her grandfather's estate; that the witness said "Do you expect money, Kit?" and she answered "Yes, I expect some from my grandfather's estate"; that since the beginning of this suit she and Catharine were talking about things they would like to have, and the witness said "Kit, did you ever get your money?" and she said, "No; it has never been settled"; that in the conversation fourteen years before the taking of her testimony "they were speaking about hard work, and about working out. Kit worked out, and she says, 'Well, if I had some of my grandfather's money I wouldn't have to work out"; and that witness then asked her if she expected some and was told she did. Anna Cleaver states in substance that she is a sister of Thomas J. Green and knew Vesta when she was young; that she heard her say that she ought to have had money from her grandfather's estate, but "was cheated out of it"; and that Vesta made this remark within two years after she went to live with Mrs. Green. Sarah Eliza Green states in substance that she knew Vesta; that she heard Vesta say that "they were entitled to money but they were cheated out of it when she was younger"; that "of course, after she [Vesta] grew up she didn't say anything more to me about it, but this was while she was small"; that it was immediately after Vesta came to live with witness, when she was about seven years old, that she made the above statement; that Vesta "hadn't clothes, you know, and she told me that was the reason why she hadn't clothes, that she would have had clothes, and better clothes, but they were cheated out of their money which their father had coming from their grandfather. She said that she had had money coming from her grandfather, but they were cheated out of it, and that was the reason why they were so poor"; that Vesta "didn't keep talking about it. She talked about it when she was younger. I don't know just when, but she didn't say anything more about it. When she grew up she didn't talk any more to me about it, and I didn't say anything more to her about it" until after this suit was commenced; that witness doesn't think Vesta "talked anything about it after she got to be about ten or maybe eleven, somewheres along there." Vesta states in substance that she did not say to Mrs. Cleaver and Mrs. Green that she had been cheated out of moneys coming from her grandfather's estate, but that the property to which she referred in her statement to them was the Corner farm. Catharine in answer to the testimony of Mote states in substance that she never heard her mother state that she (Catharine) was entitled to some money coming from her grandfather's estate. Mary McCrea, a witness for the defendants, having been recalled and examined on behalf of the complainants, states in substance by way of correction of her testimony as originally given that she did not hear Catharine say that the money she was expecting was from her grandfather's estate,—that being merely supposition on the part of the witness,—but did hear her "speak about getting this money from some farm, and I thought of course, it was her grandfather's farm, * * * from some farm and from her husband out

west." Mote, a witness for the defendants, having been recalled and examined on behalf of the complainants, states in substance by way of correction of his testimony as originally given, that he did not hear Mrs. Jamison say that her daughter Vesta was expecting money from her grandfather's estate. He further testified as follows:

"X. When you were here before and testified you said that Mrs. Jamison said that her daughter, referring to Kitty, would be entitled to her father's share, but she, Mrs. Jamison, was afraid they were going to cheat her out of it. Is that correct? A. Wait until I study it up a bit. Yes, sir; that is correct, because I don't know of anybody else she expected money from, only her husband. * * * X. That was the drift of her talk, was it, the substance of it, I mean? A. As I remember, that has been fifteen years ago."

Eliza C. Green, also a witness for the defendants, having been recalled and examined on behalf of the complainants, testified by way of correction of her testimony as originally given, as follows:

"Q. Mrs. Green, in your testimony before, you testified that you heard Mrs. Bastian, now it is, then Vesta Jamison it was, while she was living with you speak of some moneys which she ought to have had but had been cheated out of, coming from some estate. Do you have any clear recollection whether or not that was money coming from her grandfather's estate? (Objection.) Q. Do you have any recollection of whose estate it was? A. I used to hear her speak about her father's and the Jamison Farm. She said that was her father's and that she and her sister should have had that, but that they were cheated out of it, the Jamison Farm. Q. The Jamison Farm? A. The Jamison Farm. She has gone by there with me before now and she would always say, 'that ought to have been my sister's and my farm, but we were cheated out of it.' * * * Q. Mrs. Green, did you ever hear her say anything about any moneys coming from her grandfather's estate? A. Not in her younger days I didn't. Q. Did you ever at any time? A. I heard her say so last winter when she was down to see me. * * * X. Mr. Willis asked you this question: 'It was immediately after the time that she came to live with you that she had this conversaion you spoke of'? A. That I spoke of, yes, sir. She hadn't clothes, you know, and she told me that was the reason why she hadn't clothes, that she would have had clothes, and better clothes, but they were cheated out of their money 'which their father had coming from their grandfather. She said that she had had money coming from her grandfather, but they were cheated out of it, and that was the reason why they were so poor.' A. I guess I must have got tangled in her saying that, but this is what she told me last winter. I must have got tangled in it, must have got it in that way, because I don't remember her ever saying anything about her grandfather when she was little, only since, as I told you, in the winter when she was down to see me, and then she told me about her grandfather. I suppose I must have got a little tangled in it. I don't know, but that is correct. I can't call to mind at all any time that I ever heard her speak about her grandfather when I had her, and after the farm was sold I didn't hear her say anything more about her father's estate. R. Q. Which farm did you refer to? A. The Jamison Corner farm. She talked about that a good bit. R. Q. By 'last winter' do you mean the winter of 1911? A. Yes, sir; the winter of 1911 when she was down to our house, she spoke of her grandfather. If I said it otherwise, I got a little tangled because I never heard her say anything about any grandfather in her younger days, about having any money, or any money coming to her from her grandfather."

The insufficiency of the foregoing evidence to establish knowledge or even the faintest suspicion in either Catharine or Vesta of their rights under the trust or charge created by the testator and payable on the death of their father is too manifest for discussion. The remarks

made by them in their childhood as to their supposed rights evidently had reference, as stated by the witnesses, to the Corner farm, of which Edgar, and subsequently Oliver, as trustee, had gained possession, and the rents and profits of which had been received by Edgar until his death and for some three years thereafter by his widow from Oliver prior to the sale and conveyance of that farm by the sheriff under the mortgage hereafter referred to given by Edgar and his wife to American Fire Insurance Company March 31, 1886. In view of the promptness with which Catharine and Vesta took action for the investigation and enforcement of their rights after hearing from Biggs in 1904, it is, to say the least, highly improbable that had they or either of them received an inkling as to those rights at an earlier date and after reaching years of discretion, proceedings would not have been taken with equal promptness. The evidence shows that they were not, certainly before their marriage, in such financial condition as to render an assertion of their rights to the bounty intended for them by their grandfather a matter of indifference.

[4] Before considering the law of laches it is proper to say that no statute of limitations applies either directly or by analogy to this suit. The bill is filed to enforce payment of money charged by will on land as a legacy. No legal remedy exists for the enforcement of this charge, and as the exclusive right is in equity the statute of limitations is inapplicable. In Perkins v. Cartmell's Adm'r, 4 Har. 270, 42 Am. Dec. 753, where it was held by the Court of Errors and Appeals of Delaware that a legacy charged on land is not within the statute of limitations, the court said:

"These statutes in their terms are confined to actions at law, and do not extend to suits in equity. But courts of equity consider themselves within their spirit and meaning; and that sound policy and public convenience require their adoption. Hence it is an established rule, that where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases, or in reference to the same subject matter, and where the legal and equitable claim so far correspond, that the only difference is, that the one remedy may be enforced in a court of law, and the other in a court of equity. * * * The result clearly follows, that if no statute of limitation bars the case at law, the same, or the analogous case in equity is not barred."

But although no statute of limitations applies in terms or is applicable by analogy to a proceeding for the enforcement of a money charge on real estate, the court proceeded to say touching courts of equity:

"Upon general principles of their own, independently of the statutes of limitation, they have always discountenanced laches and neglect; and refused their aid to stale demands where the party has slept upon his right, or acquiesced for a great length of time. * * * The defence founded on presumptions from lapse of time, is not peculiar to courts of equity. At common law, although as has been said, it was a rule that a right never dies; presumptions were always raised from lapse of time, independently of the statutes of limitation. * * * The lapse of twenty years raises the presumption, that bonds, judgments, decrees, recognizances and other matters of record have been satisfied; and unless repelled by circumstances explaining the delay, or by evidence of an acknowledgment of the debt within that period, the presumption is conclusive, and is a complete bar under the plea of payment. A legacy charged upon land is within the same principle. No sufficient reason can be given for making any distinction in this respect between it, and the case of a judgment or recognizance binding on lands."

[5, 6] That the period of twenty years should in the absence of laches or special equities requiring the bringing of suit earlier, be allowed for the institution of proceedings for the enforcement of such a charge against real estate was recognized by the Court of Errors and Appeals in the later case of Rice v. Pennypacker et al., 5 Houst. (Del.) 279, 353, 354. It is unnecessary to refer to other decisions. The common law presumption of payment arising from the lapse of twenty years, to which courts of equity accord effect, cannot defeat the complainants. That period could not begin to run until the $16,000 charged on the land became due and payable under the terms of the will, which did not occur until Edgar's death May 1, 1886. The bill was filed April 21, 1906, less than twenty years thereafter, and ·not only is there no scintilla of evidence that the whole or any portion of the charge has ever been paid, but the contrary has been proved beyond controversy. Whatever may be the rights of the present holders of the farms as alleged bona fide purchasers for value,—a subject hereinafter considered,—I do not think the complainants can be defeated on the ground of laches. Laches with respect to the bringing of suit is unreasonable and inequitable delay in proceeding for the enforcement of a demand or right viewed in the light of the circumstances of the particular case. No rigid rule as to lapse of time is applicable. It is essentially an equitable defense, and does not depend, like the operation of a statute of limitations, upon the mere passage of time, but upon the equity or inequity of permitting the asserted claim or demand to be enforced. Halstead v. Grinnan, 152 U. S. 412, 14 Sup. Ct. 641, 38 L. Ed. 495; Alsop v. Riker, 155 U. S. 448, 15 Sup. Ct. 162, 39 L. Ed. 218; Galliher v. Cadwell, 145 U. S. 368, 12 Sup. Ct. 873, 36 L. Ed. 738; Lasher v. McCreery (C. C.) 66 Fed. 834, 841; Godkin v. Cohn, 80 Fed. 458, 465, 25 C. C. A. 557; Sayers v. Burkhardt, 85 Fed. 246, 29 C. C. A. 137; Wheeling Bridge, &c., Co. v. Reymann Brewing Co., 90 Fed. 189, 195, 32 C. C. A. 571; Hanchett v. Blair, 100 Fed. 817, 827, 41 C. C. A. 76; Ritchie v. Sayers (C. C.) 100 Fed. 520, 537. In Halstead v. Grinnan the court said·:

"The length of time during which the party neglects the assertion of his rights, which must pass in order to show laches, varies with the peculiar circumstances of each case, and is not, like the matter of limitations, subject to an arbitrary rule. It is an equitable defence, controlled by equitable considerations, and the lapse of time must be so great, and the relations of the defendant to the rights such, that it would be inequitable to permit the plaintiff to now assert them. There must, of course, have been knowledge on the part of the plaintiff of the existence of the rights, for there can be no laches in failing to assert rights of which a party is wholly ignorant, and whose existence he had no reason to apprehend."

And in Galliher v. Cadwell it is said that the cases on laches "proceed on the assumption that the party to whom laches is imputed has knowledge of his rights, and an ample opportunity to establish them in the proper forum." In view of the evidence the suggestion that there was actual laches on the part of Catharine or Vesta or either of them is preposterous.

[7] It is urged, however, by the defendants that even if it be assumed that there was no laches in fact on the part of the complainants,

no relief can be granted because, as is argued, Craven as trustee, and Stuckert, as guardian, represented both Catharine and Vesta and were guilty of laches which was imputable to those children. This position is untenable. Many decisions have been cited for the purpose of supporting it, but they have no legitimate application here. It is a well settled rule that whenever the right of action vested in a trustee is barred by the statute of limitations the right of the cestui que trust represented by him is also barred. Meeks v. Olpherts, 100 U. S. 564, 569, 25 L. Ed. 735; Hill on Trustees, 267, 504. It may be and probably is true that a similar principle of representation applies to trustee and cestui que trust with respect to laches, and that the laches of the former during the continuance of the trust relationship will be imputable to the latter. So far as Craven is concerned, it would in any aspect that might be taken of the case be an extremely harsh application of the rule to hold that by reason of any failure on his part disclosed by the evidence to execute the duties of his trust Catharine and Vesta should be prejudiced in their right to receive the amount charged under the will upon the farms for their benefit. He gave up and absolutely relinquished the trust he had assumed, as far as it was possible to do so without a judicial discharge, and took a release as trustee from Edgar, Clarence and Oliver nearly six years before the death of Edgar, upon the happening of which the share of Catharine and Vesta first became payable, they only at that time being ascertained as Edgar's surviving children. If the doctrine of representation applies to a purely equitable demand, and the crucial question relates to the effect of laches on the part of the person who has been constituted trustee, the laches, to be imputable to the cestui que trust, must be laches during the existence of the relation of trustee and cestui que trust. But it is unnecessary to decide the question whether in the view of a court of equity under the circumstances disclosed in this case that relationship could or should be recognized as subsisting at the time of Edgar's death. For whatever may have been Craven's nonfeasance as trustee prior to Edgar's death, the sum of $16,000, charged on the farms, on the happening of that event became payable, not to Craven, but to Catharine and Vesta absolutely and free of all trusts. The right to sue for its recovery was vested exclusively in them, and Craven was wholly without right or title, legal or equitable, to sue for or receive it.

He could not have maintained suit for the principal before Edgar's death, for until then it was not payable; and since it became payable by reason of his death it was payable exclusively to the children. Being under no duty and having no right after Edgar's death to enforce the charge, he could not be guilty of laches in omitting to sue, and consequently there was no laches to be imputed to Catharine and Vesta. Whether Craven omitted to do what he should have done during Edgar's life-time is an inquiry not pertinent to the question of representation with respect to the principal of the fund on or after his death. Craven was charged with the duty of raising out of or properly charging upon the farms the provision for Edgar and his children. But the actual raising of the $16,000 out of the farms and its investment, or

the securing of the payment of that sum by mortgage or other appropriate lien, however advantageous, was not necessary to the existence of the charge. That was created by the will in connection with the appraisement and the lack of personalty applicable to it. His failure to perform these mandatory acts during Edgar's life-time could not furnish the basis of a suit by him against the owners or holders of the farms in which he could have represented and bound the interests of his cestui que trustent. It may be possible that had Catharine and Vesta, or somebody duly representing them, become seasonably aware of their rights, a suit might have been brought against Craven based upon his failure to perform the above mentioned mandatory acts. But such possibility of suit could not be substituted for their right, in the. absence of laches, to enforce the trust or charge against the land, for the performance of such acts by him was not essential to the existence or enforcement of their rights. In Brown v. Higgs, 8 Ves. 561, 574, Lord Chancellor Eldon after referring to sundry decisions said:

"The principle of that case, and of Richardson v. Chapman, which went to the House of Lords, and all these cases, is, that, if the power is a power which it is the duty of the party to execute, made his duty by the requisition of the will, put upon him as such by the testator, who has given him an interest extensive enough to enable him to discharge it, he is a trustee for the exercise of the power, and not as having a discretion, whether he will exercise it, or not; and the court adopts the principle as to trusts; and will not permit his negligence, accident, or other circumstances, to disappoint the interests of those for whose benefit he is called upon to execute it."

Whether Craven's non-feasance with respect to the mandatory provisions referred to was calculated to prejudice purchasers of the farms is a question addressed, not to any fanciful representation by him of Catharine and Vesta, but to the equities attending and growing out of the purchase.

The contention that Stuckert as guardian of Catharine and Vesta was guilty of laches imputable to them cannot be sustained. There is no evidence that he at any time knew or had heard of the charge on the farms in favor of Catharine and Vesta. Nor does it appear that he had knowledge of any facts which could serve as a basis for constructive or implied notice to him of the existence of such charge. There is no evidence that he was ever told or that he ever mentioned that either Catharine or Vesta had an interest in the estate of the testator. Such knowledge or notice cannot be inferred from the fact that he was one of the appraisers of the farms. The duty of Hudson, Stuckert and Lynch under the will was at the proper time merely to appraise the farms. They had nothing whatever to do with the equalization of the shares, and the raising or charging of the share for Edgar and his children or issue. Craven was exclusively charged with those duties. Nor did the performance of their duty by the appraisers in any way involve knowledge on their part or notice to them whether at that time there was any, and if so, what amount of personalty included in the estate applicable to the equalization of shares or the payment of the share just specified. Stuckert was appointed guardian June 11, 1887, on the petition of Edgar's widow; Catharine then being about nine years and four months old, and Vesta seven

years and six months. The petition in stating that each of the minors was entitled to "a personal estate of about the value of ——— dollars; and to real estate, situate in Saint George's Hundred of about the annual value of about two hundred dollars," clearly did not refer to the rights or interests of the minors under the will of the testator, but to their supposed rights or interests with respect to the Corner farm. Under the will they were not entitled to any real estate, but in the deed of, July 18, 1885, for the Corner farm from Edgar and his wife to Oliver as trustee, which subsequently became ineffective under the terms of the trust, there was a provision for their taking real estate on certain contingencies. Further, the guardian was required to give bond in the penal sum of only $2,000 for each of the minors, whereas if it had been known or had appeared that Catharine and Vesta were entitled to receive the amount of the charge in their favor under the will and the appraisement, amounting to $16,000, both the petition and order for the appointment of the guardian would have been very different. These circumstances exclude, I think, any reasonable deduction of notice, actual or constructive, to Stuckert of the existence of the rights of Catharine and Vesta in the charge on the farms, and consequently of any laches imputable to them by reason of their relationship to their guardian. But further, Stuckert could not have represented the two children before his appointment as guardian, under any aspect of the case. And such appointment was made considerably less than twenty years before the filing of the bill.

[3] There being no laches, actual or imputed, on the part of Catharine and Vesta, or either of them, and the bill having been filed within twenty years after the charge on the farms became payable to them, and no part of the same having been paid, the question is now presented whether the defendants holding the farms are purchasers for value without notice and as such entitled to protection against the enforcement of the charge. At one time I had a strong impression that with the exception of Biggs they were so entitled to protection; but a full reargument of the case on this point and careful reflection have wholly removed that impression. The proposition advanced on behalf of the complainants, however, that the recording of the will and the various deeds, mortgages and other muniments of title was per se notice to the world, and therefore to the defendants, of their contents, I am not prepared to sustain. The statutes of Delaware provide for the recording of wills, and deeds concerning lands and tenements; in the former case declaring that the record or an office copy thereof "shall be sufficient evidence in respect to both real and personal estates," and in the latter that the record or an office copy thereof "shall be sufficient evidence." The statutes nowhere declare that such record or copy is per se notice to the world or any individual of the contents of the document recorded. Such an idea is not warranted either by the language or obvious purpose of the statutes. It is provided with respect to a deed concerning lands and tenements that if it be not duly recorded within three months (formerly a year) after its execution and delivery it "shall not avail against a subsequent fair creditor, mortgagee or purchaser for a valuable consideration unless it shall appear

that such creditor when giving the credit, or such mortgagee or purchaser when advancing the consideration had notice of such deed." Section 17, c. 83, Del. Rev. Code. The object of this provision is the protection of subsequent bona fide creditors, mortgagees and purchasers for value, against prior deeds by requiring their grantees within a reasonably short time to have them recorded in public offices where the record of their contents will be readily accessible to all persons using reasonable and ordinary care and diligence in the examination of titles. The provision of law relating to the recording of wills does not prescribe any period within which they shall be recorded as above set forth in the case of deeds, but in both cases the purpose of the recording is the same. Wade in his work on the Law of Notice, § 96, in reference to American registry and recording acts says:

"They are intended to furnish the best and most easily accessible evidence of the titles to real estate, to the end that those desiring to purchase may be fully informed of instruments of prior date, affecting the subject of their contemplated purchases."

[9] I am satisfied that the owners or holders of the Homestead, Capelle and Corner farms at the time they purchased and took title to the same were chargeable with notice or knowledge of the existence of the charge thereon in favor of Catharine and Vesta. Clearly it would have been gross negligence on the part of any one competent and undertaking to examine the title to and charges or incumbrances, if any, on the farms, not to have carried his examination back at least twenty years from the date of search; especially in view of the fact that the common law presumption of payment does not arise until the expiration of that period.

The defendant Biggs, who holds the Homestead farm, claims title thereto immediately under the sheriff's deed to him executed December 9, 1903, pursuant to a sale under the mortgage of Oliver Jamison and wife to the State of Delaware, dated April 21, 1888. This mortgage was executed about fifteen years and seven months before the deed under which the present holder immediately claims title, and refers to the real estate covered by it as being the same premises conveyed by Biggs to Oliver June 29, 1885, by deed recorded, etc. That deed refers expressly, as has appeared, to barring the entail under the will of the testator. The defendants Lawrence Lofland and Martha Lofland, who hold the Capelle farm, claim title thereto immediately under a deed from John A. Harris, Jr., and wife to them executed March 25, 1902, and mediately under a deed from Clarence Jamison and wife to John N. McCrone, executed October 27, 1885, which last mentioned deed was executed sixteen years and five months before the deed under which the present holders immediately claim title, and refers to the real estate conveyed by it as being the same premises conveyed, inter alia, to Biggs by Oliver, Clarence and Edgar, "to bar the several estates tail therein mentioned and this conveyance being executed to complete the same and put the fee simple title of the above described premises in the said Clarence Jamison." The defendant Eliza C. Green, who holds the Corner farm, claims title thereto immediately under a deed from

Louis M. Hass and wife and Henry A. Hass and wife to her executed March 6, 1905, and mediately under the sheriff's deed to Charles F. Perot, executed June 12, 1893, pursuant to a sale under the above mentioned mortgage of Edgar Jamison and wife to American Fire Insurance Company, dated March 31, 1886. This mortgage was executed less than nine years before the deed under which the present holder immediately claims title, and refers to the real estate covered by it as the same land which Biggs granted and confirmed unto Edgar Jamison June 29, 1885, by deed duly recorded, &c. This deed, as before stated, expressly refers to the barring of the entail under the will of the testator mentioned in the deed of the same date to Biggs from Edgar, Clarence and Oliver and their wives. All the deeds, mortgages, judgments, writs, petitions, orders or decrees constituting links in the chain of title of the holders of the Homestead farm, the Capelle farm and the Corner farm, are matters of record in New Castle County open to inspection by all interested in them. The holders of the three farms are obliged to and do claim and trace title under the will. In 2 Redfield on Wills, 210, it is said:

"It seems to be well settled that where lands are held by subsequent bona fide purchasers for value, but who are obliged to trace title through a devise, whereby a charge is created upon the lands for the payment of legacies, such purchasers will be constructively affected with notice of such charge, and equity will enforce it upon the lands in their hands."

In Pomeroy's Eq. Juris. § 626, it is said:

"Wherever a purchaser holds under a conveyance, and is obliged to make out his title through that deed, or through a series of prior deeds, the general rule is firmly established that he has constructive notice of every matter connected with or affecting the estate which appears, either by description of parties, by recital, by reference, or otherwise, on the face of any deed which forms an essential link in the chain of instruments through which he must derive his title."

[10] In the case under consideration, while the will provided for a charge on the farms, such charge was to be only to the extent to which the share intended for Edgar and his children or issue could not be paid out of the personalty belonging to the estate on hand on the attainment of his majority by the youngest son who should live so long and the appraisement of the farms. But the matters of record were of such a character as to put the proposed purchasers, in the absence of culpable negligence, upon inquiry which, if pursued with reasonable care and diligence, could not have failed to acquaint them with the existence of the charge in question, or at least to deter them from purchasing save consciously at their peril. Had there been any proper examination of title and search for incumbrances, express reference to the supposed estate tail under the will would have been discovered in the chain of title only fifteen years and seven months before the deed to Biggs, sixteen years and five months before the deed to the Loflands, and in less than nine years before the deed to Eliza C. Green. In view of such express reference it would have been gross negligence not to examine the provisions of the will, duly recorded, and to find that the testator devised the three farms to

Craven,—the death of Albert during the life-time of the testator theretofore appearing in the deeds constituting the chain of title,—in trust to raise out of or charge upon the farms the provision intended for the benefit of Edgar and his children or issue, and to find that such charge should exist to the extent to which such share for Edgar and his children or issue could not be paid out of the personalty, and to find that on the attainment of his majority by the youngest son of the testator who should live so long an appraisement was to be made of the farms, which appraisement was to enter into the computation of the amount of the above mentioned share. Knowledge of these provisions in the will would inevitably have suggested the pursuit of several inquiries essential to the protection of the proposed purchasers. Being chargeable with knowledge from the face of the will that Craven was to have an appraisement of the farms made, and that the share intended for Edgar and his children or issue was to be a charge upon the farms except in so far as personalty belonging to the estate was applicable to it, and that such share was to go on the death of Edgar to his children or issue, there was a duty to make certain inquiries on these points which could not be omitted in the exercise of due care and diligence on the part of the proposed purchasers or the attorneys representing them. To ascertain whether an appraisement of the farms had been made, the most natural and obvious course was to communicate with Craven on the subject, who, on the face of the will, was charged with the duty of having the appraisement made. To ascertain whether there was any personalty of the estate applicable to the share intended for Edgar and his children or issue, the most natural and obvious course was to examine the records in the office of the register of wills, which would have resulted in disclosing the fact that there was no personalty whatever applicable to such share. To ascertain whether Edgar left children to survive him, the most natural and obvious course was to communicate with Craven, Edgar's widow, or the members of the Jamison family. Had this course been pursued in all human probability the existence and whereabouts of Catharine and Vesta would have been ascertained. It does not appear that any attempt was so made or in any other manner to discover their existence prior to 1904, when it was discovered by Biggs through information from Oliver; and it does not appear that if proper effort had been made their existence would not have been ascertained at a much earlier period. Biggs in his testimony throws no light on this subject. The purchasing defendants are chargeable with knowledge or notice of those facts of which they or their attorneys could not have remained in ignorance save through an omission to observe any proper degree of care and diligence. Pomeroy states (Vol. 5, § 27):

"Knowledge of facts which would put a person of ordinary prudence and diligence on inquiry is, in the eyes of the law, equivalent to a knowledge of all the facts which a reasonably diligent inquiry would disclose."

In Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 437, 12 Sup. Ct. 239, 246 (35 L. Ed. 1063), the court quoted with approval the following rule stated by the Virginia Court of Appeals:

"Purchasers are bound to use a due degree of caution in making their purchases, or they will not be entitled to protection. Caveat emptor is one of the best settled maxims of the law, and applies exclusively to a purchaser. He must take care, and make due inquiries, or he may not be a bona fide purchaser. He is bound not only by actual, but also by constructive notice, which is the same in its effect as actual notice. He must look to the title papers under which he buys, and is charged with notice of all the facts appearing upon their face, or to the knowledge of which anything there appearing will conduct him. He has no right to shut his eyes or his ears to the inlet of information, and then say he is a bona fide purchaser without notice."

In Northwestern Bank v. Freeman, 171 U. S. 620, 629, 19 Sup. Ct. 36, 39 (43 L. Ed. 307), the court said:

"A purchaser is charged with notice of every fact shown by the records, and is presumed to know every other fact which an examination suggested by the records would have disclosed."

In Ochoa v. Hernandez, 230 U. S. 139, 164, 33 Sup. Ct. 1033, 1042 (57 L. Ed. 1427), the court said:

"It is a familiar doctrine, universally recognized where laws are in force for the registry or recording of instruments of conveyance, that every purchaser takes his title subject to any defects and infirmities that may be ascertained by reference to his chain of title as spread forth upon the public records."

Hall v. Livingston et al., 3 Del. Ch. 348, cited by the defendants, is not in point here, for the reason that the trust which it was sought to establish against land held by a subsequent purchaser for value was of a parol or oral nature, created by his vendor in favor of the complainant, the trust not being disclosed or suggested either in the deed by which the vendor acquired title or in that to the subsequent purchaser for value. The matter relied on as notice to the purchaser of the existence of the trust was wholly dehors the deeds or their record, consisting of oral suggestions to the purchaser by third persons; one of them being "a mere vague suspicion" thrown out during a conversation "directed to another point," and the other the expression of "only vague and indefinite suspicion, pointing to nothing, and in itself carrying no notice." The Chancellor naturally held that the evidence showed "at most, a want of extreme caution." In declaring that the purchaser could not be affected with notice of the trust unless the facts were so clear and undoubted as to make it fraudulent in him afterwards to take and hold the property, the court indulged in language uncalled for by the facts and in conflict with the American doctrine of notice arising from registry or recording as appears from the decisions and text books above cited, which are wholly at variance with the proposition that mala fides on the part of a subsequent purchaser for value is necessary to affect him with notice of the existence of a prior trust or equity, disclosed or suggested in the deeds through which he is compelled to trace his chain of title. United States v. Detroit Lumber Co., 200 U. S. 321, 26 Sup. Ct. 282, 50 L. Ed. 499, was also a case in which it was sought to establish notice, not from anything appearing or suggested on the face of any deed or its record, but solely from extraneous facts. No record sug-

228 F.—25

gested any infirmity of title or anything to put a proposed purchaser upon inquiry, and the court declared in substance that to affect the purchaser for value with notice the question was not, whether he had the means of obtaining and might by prudent caution have obtained knowledge of the fact, but whether not obtaining it was the result of gross or culpable negligence. This case does not, however, in any degree impair the force of the later case of Ochoa v. Hernandez, 230 U. S. 139, 164, 33 Sup. Ct. 1033, 1043 (57 L. Ed. 1427), in which it was declared, as above stated, that "where laws are in force for the registry or recording of instruments of conveyance * * * every purchaser takes his title subject to any defects and infirmities that may be ascertained by reference to his chain of title as spread forth upon the public records."

The defendant Biggs contends that even were it true, which he denies, that by reason of his participation in the conveyancing for the purpose of barring the supposed entail, in which reference was made to the will, he was charged with notice of its contents, he is nevertheless a purchaser from a bona fide purchaser and consequently is entitled to protection. This position cannot be maintained, as he became purchaser under a sheriff's sale under the mortgage of Oliver and his wife to the State of Delaware, dated April 21, 1888, which refers to the deed from Biggs to Oliver of June 29, 1885, expressly referring to the barring of the supposed entail under the will.

It is argued that as the testator constituted Craven trustee, he thereby endorsed him to all whom it might concern as one fully competent and willing to discharge his fiduciary duties, and therefore that purchasers of the farms without actual knowledge of dereliction on Craven's part should be protected against Edgar's children claiming under the will. This contention, whatever may be its plausibility, is unsound. It could be made equally with respect to all trustees appointed by deed or will, and if carried to its logical result it would present the reductio ad absurdum that negligent or careless purchasers who by reason of inattention or indifference failed to ascertain the condition of the property purchased by them should be protected as against wholly innocent objects of the testator's bounty. The statement of the proposition is its refutation.

It would seem that approximately the same degree of care and investigation might reasonably be expected to be observed by the defendants for the purpose of ascertaining whether the land sought to be acquired was clear of charges, as by the complainants, who, in the absence of definite information acted merely on surmise based upon the communication from Biggs, in ascertaining whether they had an interest in such land. But however this may be, the exercise of only a reasonable degree of care and diligence was all that was necessary to acquaint them with the facts learned by the complainants.

[11] An essential difference between the situation of the defendants and that of the complainants is that while the former were put upon inquiry the latter were not. The recording or registry of a deed or other instrument relating to land is constructive notice of its contents to all persons subsequently dealing with the title, but it does not so operate

with respect to third persons not so dealing and innocently ignorant of any rights which may be affected by such deed or instrument. As declared in Foster v. Mansfield, Coldwater, &c., Railroad, 146 U. S. 88, 99, 13 Sup. Ct. 28, 32 (36 L. Ed. 899), "If a person be ignorant of his interest in a certain transaction, no negligence is imputable to him for failing to inform himself of his rights." This statement, of course, assumes innocent ignorance, as in the case of Edgar's children.

There being absolute innocence and a total absence of laches on the part of Catharine and Vesta, and culpable negligence on the part of the present owners or holders of the farms in omitting to pursue obvious inquiries suggested on the face of the public records, making them chargeable with notice of the rights of Edgar's children in the premises, the complainants are entitled to a decree. An apportionment of the amount due and payable to the complainants as between the three farms is readily made. Their aggregate value determined by the appraisement made by Hudson, Stuckert and Lynch is $48,000, and no personalty having been applicable to the share intended for Edgar during his life-time and his children or issue after his death, $16,000, being one-third of the aggregate valuation, is chargeable upon the three farms as the amount payable to Catharine and Vesta in equal shares on the death of their father May 1, 1886. After deducting $16,000 from the total valuation of $48,000, the sum of $32,000 is left, representing what must be taken as the net value of the three farms for the purposes of equalization and apportionment, to be equally divided between Clarence and Oliver. For those purposes $10,666.66, being one-third of the total net value of the real estate represents the average net value of each of the three farms. The Homestead farm which was appraised at $22,000 represents $11,333.33 more than its net value for the purposes of equalization and apportionment. The Capelle farm which was appraised at $14,000 represents $3,333.34 more than its net value for the above purposes. The Corner farm which was appraised at $12,000 represents $1,333.33 more than its net value for those purposes. The excess of the aggregate of the sums at which the three farms respectively were appraised over the aggregate amount of their net value for the purposes of equalization and apportionment amounts, and necessarily must amount, to the sum of $16,000, which became payable to Edgar's surviving children under the provisions of the will and the appraisement. This sum must be declared chargeable against the three farms respectively as follows: On the Homestead farm $11,333.33, on the Capelle farm $3,333.34, and on the Corner farm $1,333.33, these respective sums to bear interest at the rate of six per cent. per annum from May 1, 1886, until the principal be paid. But as these respective sums with interest represent all which became due and payable to Edgar's surviving children, and as Vesta and her husband were by amendment dropped out of the case and have not since become parties to it by intervention or in any other manner, the complainants in right of Catharine P. Mathieson are entitled to receive only one-half of the above mentioned sum of $16,000, distributed as follows: $5,666.66 on account of and as charged against the Homestead farm, $1,666.67 on account of and as charged against the Capelle farm, and

$666.67 on account of and as charged against the Corner farm, together with interest thereon as above mentioned. The complainants are entitled to a decree declaring the above mentioned sums of $5,666.66, $1,666.67 and $666.67 charges upon the Homestead farm, the Capelle farm and the Corner farm respectively, payable to the complainants in right of Catharine P. Mathieson, together with interest as above mentioned; and providing that in case the owners of the said farms, or any of them, shall make default for the period of sixty days next following the date of the decree in paying to the complainants the sum or sums charged against the farm or farms of the owner or owners so making default, a trustee, to be appointed by the court, shall expose and sell such farm or farms at public sale in the manner and at the time and on the terms and conditions to be prescribed by the court for the satisfaction of the sum or sums due, charged and payable out of such farm or farms, and shall pay into court the net proceeds of sale, to be applied and disposed of under the order and direction of the court; and reserving to the court jurisdiction of this suit and the right to make from time to time such further orders and decrees therein as may be necessary to effectuate its object and as to justice shall appertain. The bill must be dismissed as against all defendants other than the owners of the three farms. Let a decree in accordance with this opinion be prepared and submitted.